**ARKANSAS LOUISIANA GAS COMPANY**

v.

**UNITED STATES.**

No. 151–55.

United States Court of Claims.

July 19, 1961.

Thomas A. Harrell, Shreveport, La., for plaintiff. Robert Roberts, Jr., Shreveport, La., was on the briefs.

Edna P. Goldberg, Washington, D. C., with whom was Asst. Atty. Gen., William H. Orrick, Jr., for defendant.

DURFEE, Judge.

The only issues to be decided in this case are those raised by the defendant's counterclaim, since it has been agreed that plaintiff is entitled to judgment on its claim for amounts due under a contract to supply natural gas to a certain Government ordinance plant. The counterclaim is based on alleged rate discrimination against the defendant through violation of a common provision in several gas supply contracts which represented that the rates set forth were not in excess of the lowest rates then available to any other customer under like conditions of service.

The plaintiff is an integrated gas company, which means that it produces, processes, gathers, transports, and sells natural gas at retail. During the years covered by defendant's counterclaim, 1942 to 1950, the largest percentage of plaintiff's sales were made to customers in the State of Arkansas. The customers included residential, commercial, and industrial users. The industrial customers ranged widely in the matters of size and required service from small dry cleaners and laundries to large power companies and aluminum processers. The Five Government chemical and ordnance plants, located in Arkansas, Louisiana, and Texas, and supplied by the plaintiff under the agreements now before us, fell between the extremes. Plaintiff gas company, as a public utility, is subject to regulation by the appropriate state agency in the tri-state area which it serves. Although the Arkansas Public Service Commission

had the authority during this period to regulate rates to customers outside city distribution plants, like the defendant, it did not do so. The principal demand on plaintiff's supply system was centered south of Little Rock between Hot Springs and Pine Bluff, Arkansas. The principal sources of plaintiff's gas were wells in east Texas and northern Louisiana. During the early part of the contract period plaintiff utilized gas from certain fields in south central Arkansas to supply its customers.

Two of the Government installations supplied were located in Arkansas and were served under what was known as the 3–B industrial rate, the same as that available to any large industrial customer in Arkansas. This rate was higher, however, than the rate offered to a number of oil refineries in that state. Two of the remaining Government plants were located near Texarkana, Texas and one in Louisiana. In general, the rates for industrial customers in Louisiana were less than those in effect in Arkansas because of proximity to the source of supply. Both interruptible and noninterruptible gas service was contemplated by the contracts between plaintiff and defendant; the counterclaim, however, is concerned only with the rates and conditions of service under which interruptible gas was supplied to the Government plants and other industrial customers. "Interruptible" service means that the company has the right to curtail gas service to such an industrial user during periods of high demand, usually the winter heating season, when necessary in order to provide service to its "firm" or "noninterruptible" customers. During an interval of less than one year within this period, the plaintiff also furnished interruptible service to the Lone Star Steel Company which, like the defendant's plants and the oil refineries, was a mainline customer off the gas company's high pressure transmission lines at that time. However, effective in July 1945, a special contract was negotiated between the steel company and the gas company which resulted in firm gas service at rates lower than those offered certain of the Government installations for interruptible service.

The defendant contends that it did not get the benefit of the lowest rate available to any other customer under like conditions of service, particularly emphasizing the lower rates offered to the several Arkansas oil refineries and the Lone Star Steel Company in Texas. Since these rates are admitted to have been lower than those offered the Government, the issues are reduced to a single question, namely, whether like conditions prevailed as to the services performed in supplying the Government installations and in supplying the refineries and the steel company. Because of the unusual circumstances surrounding the plaintiff's contract with the Lone Star Steel Company, the conditions of service for that customer will be considered separately from those of the refineries and the Government installations.

Neither party has excepted to the characteristics or conditions of service which the trial commissioner has found to affect the rates charged to plaintiff's customers. These characteristics are: the level or consistency of use throughout the year; the distance the gas is transported; the continuity of service; the state in which the service is rendered; and the type of gas required. The defendant argues that some of these conditions were comparable as they apply to the defendant's plants and to the oil refineries and that others of the conditions as to which there was a difference are not of significance in this case.

The trial commissioner has found that it is impractical for the plaintiff to determine costs of serving any particular customer and that, consequently, classes of customers are generally set forth in separate schedules. The grouping of oil refineries together in one class because of the similar service requirements which may be significantly different from other industrial concerns is a reasonable one. Within the states it served, like any public utility operating in any state, the plaintiff was required not to discriminate as between customers having like condi-

tions of service. And each of the contracts entered into with the defendant provided for higher or lower rate schedules if the state regulatory commission authorized it or if a different, applicable rate schedule would be more advantageous to the defendant. Moreover, the rates in the several contracts conform to the industrial rates in effect in the state where the particular Government installation was located.

■ We cannot agree with the position of the defendant that unless each customer in any class (in this case the oil refineries) differs in each of the conditions of service from any of the conditions of the various Government plants the Government must get the benefit of the lower rate offered the whole class. In other words, because of the plaintiff's obligation not to discriminate, which can only be practicably accomplished by utilizing class rates, the conditions of service of the refinery class as a whole may properly be compared with those of the defendant's plants in order to determine whether like conditions prevailed as between the two.

The defendant quite correctly points out that some of the conditions of the service provided the Government plants were comparable to the conditions at the refineries and the steel company. Since the counterclaim relates only to the rates involved in interruptible service, the continuity factor was the same as to all customers. Also, the type of gas supplied, with the exception of that supplied to the steel company after July 1, 1945, which situation will be discussed below, was the same to all customers.

However, the other characteristics were not the same for all customers and the differences are significant to a greater or lesser degree in determining whether like conditions of service obtained. For example, during almost all of the period in question, the refineries located in Arkansas were in close proximity to oil fields which also produced considerable quantities of gas. The refineries were located closer to the source of supply than any of the Government plants, with the exception of the one in Louisiana, and closer than other industrial users. The factor of proximity to source of supply is reflected in the low rates offered the Louisiana ordnance plant which would have paid less for its gas than did the refineries had it consumed the maximum quantity of gas which the plaintiff was obliged to deliver under the contract. The approved gas rates in Louisiana have historically been lower than the rates for similar customers in Arkansas because of this nearness to the source of supply.

■ While it may be true that the United States is free to contract for rates for intrastate transportation other than those set by state regulatory bodies,[1] we are not certain that the same is true in regard to the intrastate and interstate supply of a commodity ordinarily subject to the regulation of a state public utilities commission, even where that agency chooses not to exercise its regulatory powers. In any event, each of the contracts between the parties either took into consideration that rates were offered on a class basis uniformly throughout that particular state or contemplated that the rates might be changed by action of the regulatory agency of that state, or both. Clearly, the contracts were entered into in the light of the regulatory structures existing in each of the three states. The contract rates conform to the rates in effect in the state wherein the particular Government facility is located and they differ as between the facilities in the several states. The state in which the service was contracted for and performed is, therefore, a factor which must be considered in determining whether like conditions existed as to all customers.

■ As a class, the volume of gas consumed by the oil refineries was more than

---

1. Public Utilities Commission of State of California v. United States, 1958, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470; Hughes Transportation, Inc. v. United States, Ct.Cl., 168 F.Supp. 219; Alabama Highway Express, Inc. v. United States, Ct.Cl., 175 F.Supp. 143.

three times that of the consumption of the Government-owned facilities between 1942 and 1950. One oil refinery alone used more than the combined volume of all of the defendant's plants. And the average consumption of the refineries was greater than the average consumption of the Government plants. Since the plaintiff necessarily must sustain certain costs of production and supply which do not vary regardless of the volume supplied to a given customer, it is obvious that the greater the volume supplied, the lower the fixed expenses on a per unit basis. It is correct, as pointed out by the defendant, that the two largest consumers among the Government plants used more gas than the smallest consumer among the refineries. But, as we have indicated above, we think it is proper to consider the characteristics or conditions of the refineries and the plants as classes. The overall figures relative to the volume of consumption of gas reveal that a like condition did not exist between the plants and the refineries.

Similarly, there was a difference in the consistency of use between the refineries and the Government plants. With the exception of the most consistent user among the defendant's facilities as compared to the least consistent refinery, the "load factors" of the refineries were higher. The load factor is a significant element contributing to the expenses incurred by the plaintiff in supplying its gas. Load factor is the relationship of the amount of gas used during the lowest off-peak month to that used during the highest month. In processing crude oil, the refineries operated 21 hours a day at a high level of consumption. The load factor for all the Arkansas refineries between 1942 and 1950 was 81 percent while that for all the Government plants was 47 percent. Since the plaintiff has to be prepared to supply its customers a certain maximum level of consumption, the degree to which the customers make use of the facilities maintained by the plaintiff has a bearing on the plaintiff's cost of supplying the gas.

The circumstances surrounding the plaintiff's services to the Lone Star Steel Company require special mention. Under a contract dated October 2, 1944, the plaintiff began supplying the steel company with interruptible gas from its main line. The following year a Texas pipeline company proposed to supply Lone Star Steel with gas at rates lower than those charged by the plaintiff by building a new pipeline to nearby gas reserves then owned by the Texas company. The plaintiff was informed that it might acquire the gas in the field near the steel company but only on condition that it assume the contract obligations of the Texas company to supply gas to the steel company at the lower rates. Consequently, the pipeline company sold the gas reserves to the plaintiff; the plaintiff contracted to supply Lone Star Steel at the lower rates undertaken by the pipeline company; and Lone Star Steel released the pipeline company from its obligation to supply gas at the rate agreed upon. These provisions were embodied in a written agreement effective July 1, 1945. The evidence shows that if the plaintiff had not entered into the agreement described above it would have lost both the opportunity to acquire the Texas gas reserves and the patronage of Lone Star Steel.

After the new contract with Lone Star Steel became effective the plaintiff was required to provide gas service only from the reserves located about 18 miles from the steel company from a direct line not requiring high pressure. The gas so supplied was not required to be processed to remove excessive water and sulphur content as was the gas transmitted through plaintiff's mainline. After the plaintiff's contract to supply Lone Star Steel ended, it was able to use these reserves to supply its main line customers after processing. Even if we were to conclude that the arrangements between the plaintiff and Lone Star Steel were concluded merely for reasons ordinarily present in a simple supplier-customer relationship, we would have to conclude

that there were significant differences in some of the conditions of service to preclude comparison of that service to the service offered the defendant.

For the foregoing reasons, we conclude that those industrial concerns which received lower rates than the defendant's plants operated under dissimilar conditions of service and the defendant is not entitled to the benefit of the lower rates. The defendant's counterclaim will be dismissed. Judgment will be entered for the plaintiff in the amount of $33,140.14.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.