UNITED STATES of America,
Plaintiff,

v.

KANSAS GAS AND ELECTRIC COM-
PANY, a corporation, Defendant.
Civ. A. No. T-1838.

United States District Court
D. Kansas.

March 27, 1963.

Newell A. George, U. S. Atty., Kansas City, Kan., Robert M. Green, Asst. U. S. Atty., Wichita, Kan., John J. Cowan, Dept. of Justice, Washington, D. C., for plaintiff.

Stanley Garrity, Wichita, Kan., for Kansas Gas and Elec. Co.

WESLEY E. BROWN, District Judge.

## FINDINGS OF FACT

This is an action for breach of contract. The case is now for trial on the merits. The Court had heretofore sustained a motion for summary judgment. The case was remanded for trial on the merits by the Court of Appeals because of the existence of a good faith dispute of a material fact and for further proceedings in harmony with its views.[1]

1. This case involves a suit by the United States, hereinafter referred to as the "Plaintiff" against the Kansas Gas and Electric Company, hereinafter referred to as the "Utility" to recover alleged overpayment made under a contract for the sale by the Utility of electrical energy for the use on the Planeview Federal Housing Project, hereinafter referred to as "Planeview" located near Wichita in Sedgwick County, Kansas. The claim of overcharge involves the years 1947 to 1952. The amount of the alleged overcharge is not in dispute. It is stipulated to be $62,468.75 with interest from September 2, 1953 at six per cent (6%) per annum.

2. The contract involved is referred to herein as the "Planeview contract" and was dated June 26, 1942. The issue of fact to be determined by the Court as contained in the pre-trial order is as follows:

"What was the intent of the parties in the use of the words, 'this general class of service' in Paragraph 7(h) of the contract dated June 26, 1942?"

3. The stipulations and admissions of fact made by the parties have all been considered by the Court but for the purposes of our findings, those admissions and stipulations which go to the question of fact to be determined by the Court will be set out in these findings. The record has been analyzed generally with regard to actions of the parties prior to the execution of the disputed agreement, during its existence and after service under the agreement was discontinued.

4. The admissions of the parties show there were no extended or lengthy negotiations between the parties in connection with the execution of the Planeview contract. It followed similar negotiations and the form and terms of a similar contract between the same parties for a similar purpose in connection with a Hilltop Housing Project also in or near Wichita, referred to as the "Hilltop contract" and was dated August 18, 1941.

5. The Court received evidence with respect to the Hilltop contract as disclosing some evidence of the intent of the parties because of this admitted similarity to the Planeview contract.

6. The Hilltop contract was negotiated between the parties by written communications and not with any face to face negotiations. The negotiations started out with a wire from the Plaintiff asking for the rate available for service through a single master meter. The Utility answered that they would furnish service at standard retail rates. The Plaintiff requested information as to whether or not they could obtain wholesale service. The defendant advised that they did not have a rate applicable for wholesale service through a

---

1. United States v. Kansas Gas and Electric Company, 287 F.2d 601 (C.A.10, 1961).

master meter and proposed to serve the Plaintiff under their regular urban residential service for residential use. The Plaintiff indicated that the retail service offered by the defendant was high and advised that it was "a well established practice in the utility industry that slum clearance and defense housing projects are special customers and as such are entitled to separate rate consideration."

7. The Plaintiff called Utility's attention to the fact that commissions of nine states recognized defense housing and slum clearance projects as special customers. The Utility furnished the Plaintiff with its standard form contract which included its service regulations approved by the Kansas Corporation Commission which applied to the supplying and taking of all classes of electrical service. The Plaintiff then forwarded copies of their approved form of contract and suggested that the defendant follow it in all respects unless changes were absolutely necessary to meet special local conditions. The Utility then sent back a draft of a proposed contract calling attention to a change which they had made in Section 4 which provided for a five year contract with suitable cancellation provisions which permitted them to give the Plaintiff a five per cent (5%) discount on the rates. The Plaintiff approved of this reduction, would not approve of the service regulations nor the penalty provision for nonpayment contained in the defendant's proposal. The Plaintiff in further negotiations with respect to the proposed agreement would not approve of the service regulations because they should not enter into contracts in which it agreed to abide by all rules and regulations which apply to all corporations, partnerships, or individuals, and advised that their approved form of contract covered all necessary items. The Hilltop agreement was finally agreed to in the form prepared and submitted by the Plaintiff, but prior to its execution, the Utility asked for an executed contract in order that they could comply with the State Corporation Commission's rules and file the rate with the Commission because they could not apply the rate unless they had the Commission's approval of it.

8. The above procedure was generally followed in the negotiation, preparation and execution of the Planeview contract. There were no face to face negotiations and the Utility was required to follow substantially the same form of agreement submitted by the Plaintiff and used in the Hilltop contract. The proposed Hilltop contract had in it the same provision now in issue and contained in the Planeview contract, referred to hereafter as "7(h)".

9. On June 26, 1942, and thereafter while the Planeview contract was in force and effect, the Utility conformed to and followed the statutory procedure of filing its rates of charges to customers with the State Corporation Commission in the following ways: (a) Filing of General Rate Schedules under Section 66-117, G.S. of Kansas, 1949; and (b) Filing individual contracts for electric service which incorporates therein the rates to be charged to the customer under each such individual contract, under Section 66-108, G.S. of Kansas, 1949.

10. The Hilltop and Planeview contracts were received, filed, and approved by the State Corporation Commission. They were not filed as a part of any General Rate Schedule and no rate schedule number was assigned to either.

11. It is pertinent to these findings to include a brief description of the Planeview project, a detailed description set out in the pre-trial order was used by the experts in giving their testimony to the Court. The admission of the parties was in part as follows:

"The Planeview project was constructed in two sections, denominated project KAN-14023 and KAN-14024 respectively. Project KAN-14023, on a site of approximately 352 acres, was composed of 2,300 dwelling units; * * * buildings or facilities with square feet of floor area * * *."

536

"Project KAN–14024, the other section of Planeview was on a site of approximately 193 acres, and contained 2,200 dwelling units, * * * This section contained one main administration building and four sub-administration buildings, four auditoriums which also served as churches, and a reservoir with pumping equipment and a coal yard with railroad spur line.

"The two sections shared a fire house, five principal school buildings, and eight auxiliary elementary schools."

12. The Planeview contract may be generally summarized in the language used by the Court of Appeals [2] and that summary discloses the provisions of the contract over which the dispute has arisen. The Court of Appeals said:

"The contract required the Utility to deliver electricity to a designated point where it was metered for billing purposes. Beyond that point the Housing Authority distributed the electricity to the users and included the charge therefor in the rent as an incident of tenancy. The dispute arises over the interpretation and application of the following provision of the contract:

" 'If during the period of this contract, the Utility makes general reductions in rates or if lower rates are made applicable to *this general class of service,* then such reductions shall be applicable to the rates for the service covered by this contract.' " (Italics ours).

13. The only two people whose direct testimony could be considered informative with respect to the intent of the parties by the insertion of paragraph 7(h) in the Planeview contract at the time of its execution, were Mr. Morris Miller who represented the Plaintiff, and Mr. Frank Barr, who as Vice-President represented the Utility. Neither of these gentlemen ever met or discussed the provisions of 7(h), or any other provisions of the Planeview contract, or any other contract.

14. Mr. Miller stated that the provisions shown by 7(h) were drawn by the Plaintiff and put in the contract in general terms so that the Plaintiff would get the benefit of reduced rates under widely varying local circumstances or given to any customer who or which was similar to the housing project in terms of size, load factor or any other item that goes into rate making. The defense housing projects were entitled to separate rate consideration because the acquisition by a utility company of sizeable additional numbers of consumers formed the basis for special rates. The practice in the utility industry at the time was that slum clearance and defense housing were special customers. The usual factors which rate making people used to determine applicable rates in case of ordinary consumers did not apply to the defense housing project but the usual factors to determine a rate which apply to municipalities would be applicable to the defense housing project and defense housing projects were special customers and entitled to a special rate charge from a utility. However, the rate consideration charge was not for the purpose of establishing a price or charge on the same basis as a municipality and the Plaintiff was not seeking to be put in the class of a municipality. In seeking wholesale rates, the Plaintiff considered many factors when it was negotiating for a price or charge for wholesale block rates. These included, the rate then being extended to customers of like size, the matter of master metering, and who would maintain the lines on the project site. When the Plaintiff negotiated the contract they were seeking to establish the defense housing project as a special customer entitled to a special rate and by "special" they meant "some schedule not ordinarily and routinely available under existing schedules."

2. United States v. Kansas Gas and Electric Company, supra.

15. Mr. Barr, the Vice-President of the Utility, when he executed the contract understood that 7(h) would apply to other defense housing projects which were being considered as available to the Plaintiff but at the time the Hilltop contract was being negotiated, Plaintiff had never indicated other such projects would be constructed. Areas had been designated for other defense housing projects by city planners. He was acquainted with these designations, but Plaintiff was not. When the Plaintiff would not accept the Utility's proposal to be classified under its rate schedule designated as PW–337, which applied to municipalities, he did not consider that the term "service" as used in 7(h) would apply to any other agreement or agreements except those applicable to the Plaintiff. The term "service" meant to him not only the rates specified by the terms of the contract but all the things which would affect the rates to be charged to a customer.

16. The Hilltop and Planeview contracts were approved in the form which Plaintiff suggested, the special rate was set out in full, and according to Mr. Barr, both parties treated and considered the same as a special rate based on special circumstances.

17. At the time of the execution of the contract, the Utility had in effect a General Rate Schedule designated as PW–337 applicable to "electric service for redistribution and resale by municipalities owning and operating a local distribution system."

This rate schedule was made applicable to municipalities owning and operating a local distribution system. (Applicability clause). The schedule also had provisions with respect to "character of service", limitation of service, metering, net monthly rate, contract KW, power factor, net minimum monthly bill, gross monthly bill, prompt payment discount, adjustment for fuel cost, term discount, contract, and service regulations provided that PW–337 was subject to the service regulations of the company on file with the State Corporation Commission.

The Planeview contract under Paragraph 7, entitled, "Rate", set out the same schedule block rates which appeared in PW–337. It also provided a clause with respect to "contract KW", to the "power factor", to a "minimum charge", to an "adjustment for fuel cost", to a "term discount", to "a limitation of service" and the controversial clause 7(h) "Revision of Rates."

The actions of the parties after the execution of the Planeview contract disclose the type of conduct illustrated by the following findings.

18. In the fall of 1942, the Utility adopted a schedule designated as PW–942 which cancelled PW–337 and applied to "all electric service supplied for resale to municipalities whose entire requirements are supplied under this schedule at one metering point."

It had an applicability clause, a net monthly rate for a schedule block rate. A provision for a gross monthly bill, a payment clause, a demand clause, and a provision that the service regulations were subject to the orders of regulatory bodies having jurisdiction and to the service regulations of the company.

When this schedule went into effect the Utility advised the Plaintiff by letter of April 16, 1943, in part as follows:

"We have electric service contracts for the supplying of electricity to Housing Developments, Identification Nos. KAN–14021, KAN–14022–X, KAN–14023, KAN–14024, and KAN–14026. The net monthly rate included in these contracts was practically identical with our Rate Schedule PW–337, which was our published rate for wholesale service to municipalities for resale. This schedule was superseded in October, 1942 by our published Schedule PW–942, which is a reduction under the old schedule. Inasmuch as this revision of rates covers service which is similar to that included in the government contracts for the housing projects, we feel that the reduction should be applied to the contracts * * *.

"We offer this reduction to the Government made retroactive to October 1, 1942, the effective date of the rate, and will place the billing under these contracts on this basis upon your authority to make this change. No doubt, you have a short form of supplemental agreement which will cover the situation and we will await receipt of your advice before taking any action."

On April 26, 1943, Utility stated with respect to the rate schedule change, in part as follows:

" * * * Under the present operating conditions, it would not be to the Authority's advantage to change rates. As the load factor improves, there will probably be a time in the future when service to Hilltop Manor will be cheaper under the proposed schedule. We will watch the situation and keep you advised.

"The question of the better rate for service to the Planeview and Beechwood projects would, of course, depend upon the load factor which is produced by them. This too will be watched and you will be advised if and when it becomes cheaper for the Authority to operate under the new schedule.

"As we told you over the telephone, we will be able to serve the individual customers in the commercial development at Hilltop Manor on the retail basis, but would like to have a detailed description of their location showing, if possible, the service entrance and including an approximate estimate of their load requirements in order that we may obtain approval from the War Production Board for the extension required."

20. The Plaintiff contends that this action on the part of the Utility was an attempt to put 7(h) in effect consistent with the Plaintiff's interpretation of the meaning of the section. The offer of the Utility was not accepted by the Plaintiff and in fact was rejected because the Plaintiff would not have received a lower rate under the schedule. The Court has considered it as evidence to show the intention of the parties, but it is far from being conclusive, that the Utility interpreted the provision of 7(h) as applying to its rate schedules to municipalities. It could just as easily be interpreted as an effort on the part of the Utility to get the Plaintiff to come under the provisions of its rates for wholesale rate service to municipalities. It could also show that the Utility considered that Plaintiff was not covered by the classification or the rate would automatically apply and a supplemental agreement would not be necessary.

21. In 1947, the Utility adopted Schedule PWM–247 which cancelled PW–942 and applied to "all electric service supplied under company's standard 'agreement for electrical service' to public utilities for resale. It had an application clause, a net monthly rate clause which we have previously described as the schedule block rate, a provision for gross monthly bills, a payment clause, a demand clause, a contract period clause, and a service regulation clause which provided that the service was subject to the orders of regulatory bodies having jurisdiction and to the service regulations of the company. The Utility did not offer Plaintiff the rates under PWM–247.

22. From 1942 to 1952 the Plaintiff owned and operated the electrical distribution system in Planeview by which the tenants thereof received electricity. The Utility delivered electricity to a master meter at a point of delivery, used it for general project purposes, and delivered it to tenants in Planeview. The Plaintiff did not install meters in residential units or charge tenants on the basis of actual quantities of electricity used; but instead Plaintiff furnished to each tenant in consideration of part of the rental the necessary amounts of electricity.

23. Utility did not have on file on June 26, 1942, or at any time between that date and March 1, 1952, a General Rate Schedule or classification that spe-

cifically mentioned Federal housing projects.

23(a) The Utility did not make a general reduction in its rates while the Planeview contract was in force and effect. It had various "general rate schedules" applicable to various classes of service in addition to PWM-247, PW-337 and PW-942.

24. The bills submitted by Utility to the Plaintiff during the period from 1941 to 1952 under the Hilltop, Planeview and Beechwood Contracts bore the notation "PW-337". All bills rendered by the Utility to the Plaintiff under the terms of the Planeview contract were paid during the entire time the contract was in force and effect without any claim of fraud, duress, mistake of fact or under protest. The revenue received from the Planeview, Hilltop and Beechwood public housing projects are reported in the Utility's 1948, 1949, 1950 and 1951 Annual Reports to the Federal Power Commission as shown on page 74-3, being the last item under Account No. 604 in each report.

25. The notation "PW-337" on the bills of Hilltop, Planeview and Beechwood contracts was a notation placed thereon by the billing clerks of Utility because of the "block rate schedule" furnished to them for the purpose of computing the amount of the bill. It had no reference to classification of service. The reports to the Federal Power Commission were statistical reports.

26. Upon the cancellation of the Planeview contract, there was due the Utility from the Plaintiff the sum of $19,646.77 under the provisions of paragraph 4 of the Planeview contract for early cancellation before the end of the second five-year term of the contract. This claim of the Utility was never mentioned to the Plaintiff prior to August 1955. It was considered by Utility, but, as a result of Utility's signing of Supplement No. 1 to the Planeview contract, it was concluded that Utility would not bill for these amounts.

27. Utility purchased the distribution facilities covered by the Planeview contract and other housing projects from Plaintiff February 21, 1952. It forwarded to Plaintiff a supplement to the Planeview contract which provided that the parties agreed to cancellation of service and further agreed that "all obligations, rights, liabilities, requirements and other provisions called for in contract now HA (KAN-14023) mph-1, are terminated as of Midnight, February 29, 1952." This Supplement No. 1 was stamped cancelled 2/29/52, but was not signed or returned to Utility. After the sale of the facilities of the Planeview and other housing projects to Utility, Plaintiff entered into fifteen contracts with the Utility which embraced and included provisions making the contracts applicable to one of Utility's general rate schedule.

28. The Planeview contract was cancelled by action of the State Corporation Commission on April 2, 1952, in docket No. 52-U-59.

29. We set out in brief some of the other contentions of the parties supported by evidence.

30. Plaintiff made a comparison of five contracts Utility had with municipalities in its "General Rate PW-337 Schedule" filed with the State and disclosed that:

"Five municipalities have the same maximum contract demand as the Planeview contract; two municipalities have the same minimum contract demand provision. All municipalities contracts and the Planeview contract provided for a single delivery point. Two municipal contracts made the same delivery voltage as the Planeview contract; two municipalities also had an identical provision for the metering voltage."

31. The Utility pointed out many differences in the Planeview contract and the class of service it gave to municipalities under PW-337, PW-942, and PWM-247. One primary difference was that the municipalities were governed

by the General Rate Schedules which were made subject to the "service regulations of the company" (Utility), approved by the Corporation Commission of Kansas. In addition, Utility showed the Plaintiff demanded and received in the Planeview contract the provisions which were not available to the municipalities or public utilities to which the applicable rate schedule applied. We list a few of these: (a) The Plaintiff was entitled to an unlimited quantity of electric energy to meet its requirements. (b) The Plaintiff obtained the unlimited right to require the Utility to discriminate against other customers to supply its electrical service requirements without being limited by the general service regulations of the Utility. (c) The Plaintiff had cancellation privileges not enjoyed by the municipalities and public utilities to which the general rate schedules PW–337, PW–942, and PWM–247 applied. (d) The Plaintiff was not subject to the provisions for the suspension of service because of nonpayment. There were other differences between Planeview contract and the general rate schedules referred to above, but the foregoing will suffice in our consideration of the expert and other testimony.

32. Both parties produced experts to sustain their position. The experts qualified as such. The experts had all examined the exhibits and pre-trial order. The substance of their testimony is that they came up with different conclusions as to the meaning of the phrase, "this general class of service."

33. The experts arrived at their conclusion that 7(h) did or did not require the Utility to give Plaintiff the benefit of PWM–247 on the emphasis they placed on the factors which go to make up rate schedules or service classifications. The Plaintiff's expert would limit the establishment of service classifications for rate schedule purposes to the load characteristics of the product sold, namely, quantity used, time of use and manner of service. He was free to admit that other factors than cost were sometimes given consideration. The Utility's ex-

perts were of the opinion that load characteristics and costs were to be considered but were not controlling. With this later conclusion, we agree, to hold otherwise would ignore the problems with which the business community is continually faced. A few of these problems hereinafter set forth are illustrative. Private businesses are organized for profit. Profits are realized only from earnings upon investments and sale of commodities and service. Profits are only available after payment of taxes, the costs of the commodities and of doing business. The price to be charged for the commodities and services sold must be in excess of all these costs to provide earnings sufficient to permit such a profit. Price is limited in a free economy, however, by competition. Competition is not limited to the same service or commodity but to other commodities or services supplying the same result, or the ability of the customer to obtain the same commodity or service from an additional source. In the public utility field price is also limited by government regulation. These regulations establish standards of service in addition to limitations on the establishment of the price or charge to be made.

34. In order to resolve the dispute of the experts and relate it to the exigencies faced by the business community, it is important to distill from their evidence in relation to other evidence what is meant by the terms "general rate schedules", "service classification" or "classification of service".

35. In "general rate schedules" of utility contracts, there is a block type rate section. These "block" rates are determined by dividing the total amount of energy to be consumed during a definite period of time into prescribed quantity blocks or steps and providing a different price usually lower, for each block or step.

35(a) The word "general", in "general rate schedules" refers to the classification of customers to whom the "block rates" and the service obligations in "general rate schedules" apply. A

utility may have several "general rate schedules" in effect for different classification of customers at the same time. The "block rates" may or may not be the same in various "general rate schedules".

35(b) The general rate schedules as distinct from "block rates" contain additional provisions and there is considerable degree of non-conformity in general rate schedule terms and conditions. In the utility industry, rate making is considered an art not a science.

35(c) The general rate schedules are not based upon the cost of service alone and this may not be the main criteria, but include among others, the value of the service to be rendered, the economics of the area involved, the regulatory climate to which the utility is subjected, the competition, the Utility's policy and history.

36. "Service classifications" in utility rate making are made for various purposes and have changed over the years. The term is used and is synonymous with "classification of service," and generally refers to a designated grouping of customers by types or categories generally by purpose of use or by type of customer.

36(a) The purposes of "service classifications" depend to a large degree on the results desired by classification. Familiar services classifications are for revenue, statistical and rate schedules or design.

36(b) Service classification for rate designed purposes or for establishment of rate schedules are based on groupings of customers in accordance with quantity of power used, the time of use, the manner of service, the cost of service, the regulatory climate in which the utility is operating, the competition, the economics of the area served at the time of service, the utilities policies and history, and other factors.

36(c) In other words, service classification for rate schedules are groupings of customers established to classify customers within a group in order to make the rate schedule available to customers receiving similar service and makes it feasible to serve the classification without undue refinement and administrative difficulty and when approved by regulatory bodies without fear of being accused of discrimination in cost of service to various customers.

36(d) The reason for not having a service classification for a customer is because the nature of the service to be given makes a group classification impractical or unnecessary.

36(e) The entire contract is considered in determining whether or not a customer should be placed in a group or service classification.

37. The Court finds that the use of Schedule PW–337, PW–942, and PWM–247 on reports by the Utility to governmental agencies were made for statistical purposes.

38. The ultimate conclusion of fact by this Court is that the term "this general class of service" was not intended to refer and did not refer to the General Rate Schedules of the Utility as shown by PW–337, PW–942, or PWM–247.

CONCLUSIONS OF LAW

The pre-trial order outlines the question of law to be determined by the Court as follows:

"Was the Utility's failure to apply the reduction in rates afforded by Utility's general rate schedule, PWM–247, a breach of 7(h) of the contract of June 26, 1942?"

The parties have agreed that the Utility did not make a general reduction in its rates while the Planeview contract was in force and effect. The question of law is thus limited to the application of Utility's general rate schedule, PWM–247, to Plaintiff if it is legally considered under 7(h) as the "same general class of service" supplied by the Utility to that class of customers coming within the provisions of PWM–247 which was made applicable to "All electrical service applied under company's standard agreement for electric service, to public utilities for resale."

■ 1. There are certain general rules which have been established to govern the triers of fact in their interpretation and construction of disputed contracts. The rules for interpretation of contracts have as their basis the provisions of our federal constitution which prohibit the impairment of obligations of contracts and are also intended to prohibit every mode or device having such purpose. This is particularly true with respect to contracts entered into by the United States which are affected by public policy.

2. Williston on Contracts [3] has also outlined certain other standards buttressed by authorities for the interpretation and construction of contracts. We list some of these because they constitute the rules for the interpretation and consideration of the evidence presented to this Court in arriving at its ultimate conclusions of fact and law.

■ (a) The meaning of the writing at the time and place it was made between persons of the kind of class who were parties to it must be determined. In considering this provision the trier of fact must put himself in the place of the parties at the time the contract was executed and to look at it in prospect rather than retrospect because where money is involved, the perspective of the parties is apt to be clouded by the unexpected chance of gain or self interest.

■ (b) The common or general meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to it. This rule was considered only insofar as applied to language which was not technical.

■ (c) Technical terms or words of art in a contract will be given their technical meaning unless the context of local usage shows a contrary intention. This was determined to be a question of fact for the determination of this Court.[4]

■ (d) The contract will be read as a whole and every part will be interpreted with reference to the whole and if possible, it will be so interpreted as to give affect to its general purpose and render it meaningful, fair and reasonable.

■ (e) The circumstances under which the contract was made, will be considered to show the intent of the parties.

■ (f) The interpretation of the contract given by the parties themselves will be favored.

■ (g) Agreements affecting the public interest are generally to be construed liberally in favor of the public, but where the public grant is not merely for the grantee, but is for the express accommodation and convenience of the public, everything which is reasonably proper and necessary to effect the essential object of the grant, also passes by implication.

√ ■ (h) In addition, what have been designated as contracts of adhesion by Williston, where one of the parties is in a disadvantageous bargaining position because the provisions are standardized or stereotyped the contract is narrowly construed against the writer.

■ 3. The issue of law to be determined by the Court depends on the interpretation of the facts under the applicable rules referred to above and the applicable presumptions and inferences to be drawn from the evidence by the trial court. The Court may take judicial notice of facts or evidence which are matters of common knowledge. As the trier of the facts, the Court is permitted to draw from facts which it considers as having been proved such reasonable inferences as seem justified in the light of common experience. Among the obvious presumptions which govern a trial court are, that a witness speaks the truth, that official duty has been regularly performed, that private transactions have been fair and regular, that the ordi-

---

3. Williston on Contracts, Interpretation and Construction of Contracts, Volume 4, Chapter 22.

4. United States v. Kansas Gas and Electric Company, supra.

nary course of business has been followed, that things have happened according to the ordinary course of nature and the ordinary habits of life and that the law has been obeyed.

4. Congress, has in various instances provided, that in actions where the Plaintiff is involved that the burden of proof rests upon the party challenging plaintiff's actions. Our research does not disclose that this is the rule in this action. Plaintiff comes into Court as any other suitor. Thus the Plaintiff must establish its case by a preponderance of the evidence.[5] This simply means such evidence when considered and compared with that opposed to it which has more convincing force and produces in the mind of the trier of fact a belief that such evidence is more likely true than not true.

5. The record in this case discloses a good faith dispute of material fact. This required a full inquiry and proper evaluation by the trial court of the facts relied on by each of the parties.

6. The contract in question was written while this country was engaged in a world war. The public interest was being served by both parties when the contract was executed. The success of that war effort must be measured by the will of the people to carry it through to a successful conclusion. This required not only the ability of those people in combat, but also depended on the great productive capacities and economic strength of the people in the face of the adversity caused by the demands of war. If the Utility failed to agree to Plaintiff's views of its needs, for its war effort, it could have taken over the Utility's operations. Power was in short supply, available facilities could not be expanded except with materials also in short supply. This was the background against which the parties negotiated the contract.

7. Plaintiff's agents were familiar with the utility industry. They were aware of this Utility's procedures to classify service and make their "rates" applicable on the basis of a classification service. They know or should have known that from an accounting or administrative practice, it would never occur to the Utility after the contract had been in effect for a few years to even consider that the change in the rate schedule for its different classification of service would be applicable to Plaintiff's special contract unless they were in the classification to which the rate schedule change applied. It is admitted that the Utility had various "general rate classifications" and under Plaintiff's theory the Utility would have had to classify Plaintiff to any such classification to which Plaintiff contended it was similar.

8. There are very few cases applicable to the present problem and none that we have found directly in point. In another action where the Plaintiff entered into contracts for gas supplies for the years 1942 to 1950, and sought to obtain a judgment by virtue of a failure of a utility to supply natural gas to a certain government ordinance plant on the same basis that it supplied gas to a steel company, and where gas was offered on a class basis uniformly throughout each state and it was contemplated that rates might be changed by a state's regulatory agency, the Court held that the regulatory structure should be considered in determining whether like conditions existed as to all customers.[6]

9. This holding does not in our opinion require the Plaintiff to accept state policy,[7] or that unilateral filings with the state regulatory body or ex parte classification by that body are decisive or controlling. We do consider that it is evidence to be considered with other evidence to arrive at the intent of the parties. Neither can we consider the billing practices of the Utility by stamp-

5. 54 Am.Jur. pp. 627, 630.

6. Arkansas Louisiana Gas Company v. United States, 291 F.2d 936, U.S. Court of Claims, 1961.

7. Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). See also 42 U.S.C.A. § 1521 et seq.

ing bills, PW–337, decisive or controlling, but it was considered with other evidence to arrive at the intent of the parties.[8]

10. The term, "this general class of service" as used in the industry with which both parties were familiar did not refer merely to the "block rate schedule", it referred to both the block rate schedule and each and every other provision of the service required to be performed by the Utility to a designated general class of customers.

▆▆ 11. The Plaintiff as the writer of the contract had a burden to see that ambiguity did not exist and the Court in our opinion, should consider the rules of construction of contracts in weighing the evidence. If Plaintiff, the drafter of the form agreement submitted and used, had had the intention that the phrase should apply to the "block rate" only or to a general rate schedule, applicable to a municipality, they could have said so in simple and unmistakable terms. The Plaintiff wanted a special rate and obtained it. They wanted a special service without being subject to the regulatory bodies which exercise control over the Utility. They got it. They were careful in the language of the agreement to provide for their benefit if the Utility made general reductions in rates without regard to any class of service but by reference to lower rates to "this general class of service" they were at least recognizing that they were a special class of customer and that they would receive the class of service contained in the contract because of their governmental immunity and power.

12. One of the contentions of Plaintiff is that we must interpret the disputed language to give it some meaning [9] and that the only interpretation of the phrase to give it meaning would permit Plaintiff to profit by the reduction offered to municipalities.

13. We cannot agree with Plaintiff that its interpretation is the only one. Plaintiff, like the Utility, has administrative and accounting problems with respect to its commitments to develop uniform procedures applicable to providing uniform accounting, payment and statistical reports.[10]

14. The evidence of Plaintiff's witness, Miller, disclosed that slum clearance and defense housing projects were considered as "special". In other words, a special class for service and rate considerations. We are of the opinion that the Plaintiff recognized the possibility and probability (which actually occurred) that it would establish other defense housing projects which would make feasible and practical the special classification. It intended to obtain the benefit of a general rate reduction and a rate reduction given to other slum clearance or defense housing projects as the same class of service, to simplify its administrative and accounting problems. Thus it could classify all of its contracts with the Utility in the same class and be assured that the service rates with respect to these contracts would be the same for its required statistical and payment purposes. Difference in such rates and service would be easily discovered and classified.

15. The Utility has sought from the beginning of this case to raise the issue that the Plaintiff is estopped by virtue of its laches in bringing this action to now recover from the Utility. Such defenses are not available to the Utility in an action by the Plaintiff. This was not an issue to be determined by the Court, by the pre-trial order or by the standards fixed by the United States Court of Appeals in its consideration of this case.[11]

8. United States v. Kansas Gas and Electric Company, supra.

9. Broderick Wood Products Company v. United States, 195 F.2d 433 (C.A.10. 1952).

10. See Generally, 31 U.S.C.A., Money and Finance.

11. United States v. Kansas Gas and Electric Company, supra. See also United States v. Kingman Water Company, 9 Cir., 253 F.2d 588.

16. The law applicable to the Plaintiff, however, in this case did not shift the burden of proof to the Utility to establish that it did not breach the contract in question because of Plaintiff's allegation in its petition. Plaintiff was still required to show by a preponderance of the evidence, that it was the intent of the parties that the term "this general class of service" referred to the Utility's general rate schedule applicable to municipalities. In our opinion, it did not sustain this burden and the Utility did not breach the Planeview contract.

## JUDGMENT

The Clerk of this Court will enter judgment for the Utility, Kansas Gas and Electric Company.