UNITED STATES of America, Appellant,

v.

Jess E. FRANCIS, Appellee.

No. 17607.

United States Court of Appeals Ninth Circuit.

June 28, 1963.

William H. Orrick, Jr., Asst. Atty. Gen., Francis C. Whelan, U. S. Atty., Alan S. Rosenthal and Sherman L. Cohn, Department of Justice, Washington, D. C., for appellant.

Silver & Cole, Bertram S. Silver and William L. Cole, San Francisco, Cal., for appellee.

Before BARNES, JERTBERG and BROWNING, Circuit Judges.

BARNES, Circuit Judge.

This is an action in which the United States (appellant) seeks restitution under Section 322 of the Transportation Act of 1940, 29 U.S.C. § 66, for overpayments allegedly made by it on twenty-seven charges rendered by appellee, operating as the Continental Freight Lines.

The district court, having jurisdiction under 28 U.S.C. § 1345, on April 28, 1961 entered judgment holding for appellant on twelve of the twenty-seven asserted overpayments, and for appellee carrier on the remaining fifteen; nine of these remaining fifteen are the basis of this appeal.

This court has jurisdiction on appeal. 28 U.S.C. § 1291.

The shipments that relate to the nine asserted overpayments which are the basis of this appeal were transported during the period November 16, 1953 through March 30, 1954. All of these shipments were transported between points solely within the State of California.

All of these were transported on government bills of lading. This form of bill of lading contained, among other things, a section for the description of the articles transported. The printed instructions given on the bill of lading relative to such description were "Use carriers' classification for tariff description if possible, otherwise a clear non-technical description."

During the period in question, appellee had filed rates with appellant as a party to the T. A. L. Loretz U. S. Government Rate Quotation No. 1 (Loretz Quotation). This quotation is limited to shipments for the United States Government and is prepared in the form of a motor carrier tariff.

The Loretz Quotation incorporates by reference within its provisions "Western Classification No. 75." This document constitutes a compilation of most known commodities and the classification (i. e., First Class, Second Class, etc.) into which each commodity has been placed. The Western Classification No. 75 is pub-

lished as a part of the Consolidated Freight Classification No. 20. The Western Classification also sets forth various rules concerning tariff applications.

Appellant cites as error that portion of the district court's Finding II applicable to Items 5, 6, 7, 8a, 9 and 10; also, that portion of Finding III applicable to Items 11 and 11a; and, all of Conclusion of Law IV.

Findings II and III state:

"II.

"With reference to Items 4, 4a, 5, 6, 7, 8, 8a, 9 and 10, as listed in Column A of the attached Appendix, the rate charged in the Bill of Lading was agreed on by the United States through its Transportation Officer acting in the course and within the scope of his official duty and authority.

"III.

"With reference to Items 11, 11a and 17, as listed in the attached Appendix, the Bill of Lading on its face demonstrated a request for exclusive use."

Conclusion of Law IV states:

"Where intra-state freight is transported by a non-certificated carrier, which does not have a published tariff, a price posted on the Bill of Lading by the United States is a valid offer which if accepted becomes contractually binding on the United States."

The shipments in question fall into three different categories, which are herein described as Groups I, II and II.

GROUP I FACTS

The first group, consisting of five shipments (Items 5, 6, 7, 9, 10), involves alleged overcharges resulting from an alleged misdescription of the commodity transported. These shipments all involved the same commodity, the same point of origin, Camp Irwin, California, and the same point of destination, Herlong, California.

Appellee argues that the commodity transported consisted of pieces of brass that had been compressed together into rectangular bales and which were being sent to Herlong to be remelted. Appellant maintains that the brass articles that were compressed together into bales were expended cartridge cases.

The description placed by appellant's agents on the bills of lading covering these shipments is the same in each instance. It reads: "SCRAP NOIBN [not otherwise indexed by name], HAVING USE FOR RESMELTING, NMFC #11 [National Motor Freight Classification No. 11] ITEM #13850."

The appropriate item in the Western Classification (which is the applicable classification, since it is the one incorporated into the Loretz Quotation) is Item No. 6435 and reads:

"6435 Scrap, noibn (scraps or waste pieces or bent, broken, crushed or worn out articles or used wire, having value for remelting purposes only), loose (LCL only if weighing each 50 lbs. or over) or in packages."

The scrap brass item in both the Western Classification and the National Motor Freight Classification was classified as fifth class; the applicable fifth class rate from Camp Irwin to Herlong during this period of time as set forth in the Loretz Quotation was ninety-seven cents per hundred weight. This is the rate that appellee assessed. There is no controversy that if the article was properly described on the bill of lading as scrap brass the ninety-seven cent rate is proper.

During this period of time there was set forth in the Loretz Quotation a commodity rate of seventy cents per hundred weight from Camp Irwin to Herlong on the commodity "cartridge cases, empty, returned." Appellant maintains that the commodity transported should have been described as "cartridge cases, empty, returned" and rated at the seventy cent rate.

The district court held that appellee had correctly described this group of shipments, and that the charges made

therefor were proper, as indicated in Finding II and Conclusion IV set forth above.

## GROUP II FACTS

The second group of shipments (Items 8 and 8a) consist of shipments of explosives (i. e., detonating fuses) with other commodities. The weights of the individual components of these shipments are shown on the respective bills of lading.

There was set forth in typewritten form on the bills of lading, in that portion allotted to commodity description, not only the description of the commodities transported, but also the statement: "Rate $ .68 cwt. minimum weight 20,000 lbs. truckload." The bills of lading also contained the statement: "Waiver to move by truck granted in accordance with ICC Reg. OP-5 Change 11." These bills of lading were prepared and signed by appellant's agents.

Appellee charged for each entire shipment at the higher rate applicable to one of the articles, i. e., $ .68 cwt. Appellant contends that the charge should have been made in accordance with the rate applicable to each portion of the shipment.

The district court held for appellee on this group of shipments, as also indicated in Finding II and Conclusion IV set forth above.

## GROUP III FACTS

The third group of shipments, consisting of two shipments (Items 11 and 11a), are in issue because on these shipments certain specified units of equipment were ordered by appellant and furnished to it by the appellee. In one shipment some five units of equipment were ordered and furnished, and in the other three units of equipment were ordered and furnished.

On the bill of lading of one shipment, typed in with the commodity description, was the following statement: "Furnished: * * * 5 Trucks 71,450# Cube 4562", and, typed in with the commodity description on the bill of lading of the other shipment was the following:

"FURNISHED 1 SET 20 FOOT DOUBLES CU. CAP. 2 35' SEMI CU. CAP. /2798' 19,920 LBS. 700' 2449' 14,940 LBS 19—49,800 529' (EACH)."

Appellee contended that these notations were sufficient to constitute an order by the appellant for exclusive use of the equipment furnished and that the equipment was chargeable on the basis of certain minimum rates. Appellant contends that the bills of lading were not properly annotated to evidence exclusive use by the appellant and that appellee was precluded from applying fixed minimum rates.

The district court, as indicated in Finding III, found that the bills of lading on their face "demonstrated a request for exclusive use."

### PRELIMINARY QUESTIONS

The major issues on this appeal relate to these three differing categories of shipments; but before these may be dealt with, two preliminary issues must be met.

■ The first is whether or not appellant could bring an action for restitution under Section 322 of the Transportation Act of 1940. Appellee contends that since this section is "limited to carriers subject to the Interstate Commerce Act * * *" and since the "nine shipments which are involved in this appeal are all intrastate shipments having been transported between points solely within the State of California * * *", appellee, "in performing such transportation, was not subject to the Interstate Commerce Act," and was not, therefore, subject to Section 322, Section 322 being "limited to interstate shipments." (Appellee's brief, p. 13.)

Section 322 of the Transportation Act of 1940, 49 U.S.C. § 66, states, in part: "Payment for transportation of the United States mail and of persons or property for or on behalf of the United States by any common carrier subject to the Interstate Commerce Act, as amended * * *."

The important phrase in Section 322 is "subject to the Interstate Commerce Act." The Loretz Quotation was filed with the United States pursuant to the authority of Section 22 of the Interstate Commerce Act, 49 U.S.C. § 22. Appellee, on page three of its brief, states:

"Likewise during the period in question appellee had filed rates with appellant as a party to the T. A. L. Loretz U. S. Government Rate Quotation No. 1 (Loretz Quotation). This quotation is limited to shipments for the United States Government and is prepared in the form of a motor carrier tariff."

By becoming a party to the Loretz Quotation, appellee must be considered to be within the meaning of the Section 322 phrase "common carrier subject to the Interstate Commerce Act." Appellee, having voluntarily become bound as a carrier "subject to the Interstate Commerce Act," cannot now claim it is not so bound. We hold he has waived any claim he is excluded under Section 322.

■ The second preliminary issue is whether appellee had the burden of proving in the district court the correctness of its charges, or appellant had the burden of establishing overcharges. In a case interpreting Section 322 of the Transportation Act of 1940, the United States Supreme Court held that the carrier, who was suing the United States Government to recover an amount deducted by the Government from a bill for transportation services rendered six years after the alleged overcharge by the carrier, was entitled to recover only if it satisfied its burden of proving that the earlier charges were computed at lawful and authorized rates. United States v. New York, N. H. & H. R. Co., 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247.

The only difference between the cited case and the instant case is that in the latter the United States Government is suing instead of the carrier. If the Government's statutory protection against overcharges is to continue undiminished, this difference cannot be held sufficient to shift the burden of proof. The Government, in instituting the action, would

be in no more favorable position than the carrier, when it sued the Government.

## GROUP I: CONCLUSION

Appellant contends that a carrier's charge must be based on the rate applicable to the article actually shipped, and not to the article as described on the bill of lading; that the bill of lading description is not conclusive as to the true nature of the goods;[1] that the true description of a shipment governs the rating;[2] and that, therefore, the charge on Items 5, 6, 7, 9 and 10 should have been that applicable to empty cartridge shells, "the article actually shipped."

■ Rule 2 of the Consolidated Classification, applicable here by reason of Item 15 of the Loretz Quotation, states, in part: " * * * When found to be incorrectly described, freight charges must be collected according to proper description."

What was the article actually shipped? Appellee Jess E. Francis testified that he saw three to five of the shipments and that those that he saw contained compressed "scrap brass" in bales or bundles; but, that at that time he did not know whether it was cartridges that had been compressed. (Record, pp. 60, 61, 72, 73.) James L. Callan, an employee of the Transportation Division, General Accounting Office, testified that he was told by the "man that shipped" the items in question that it was "shells." (Record, p. 112.) Mr. Callan, referring to the items in question, further stated that a truck carrying these items was "going for resmelting as soon as it gets to its destination whether it is light or bulky." Also, he said: " * * * This, in general, is scrap—you could call it that since there is no item in the classification—none for empty cartridge shells—used, expended—there is nothing in the classification that covers everything. If you don't have something to cover it you put it in that item." (Record, pp. 113–114.)

The basic question is one of fact: were the items in question returned cart-

ridge cases, or were they compacted cartridge cases?

■ Based on the testimony set forth above, the finding by the district court that the items in question were compacted cartridge cases, which is implicit in Finding II when read in the light of the record, cannot be held to be clearly erroneous.

■ When wornout metal articles are reduced to other than their original form for remelting purposes and shipped for remelting, they are properly described, classified and rated for transportation rate purposes as scrap metal, rather than being classified and rated as the original article itself. Scrap Tin Plate Between Minnesota and Illinois, 256 I.C.C. 15.

## GROUP II: CONCLUSION

Appellant contends that the district court erred in allowing charges on Items 8 and 8a to be figured on the application to the entire shipment of the rate applicable to the higher-rated article.

Item 90 of the Loretz Quotation provides, in part:

" * * * when two or more commodities are included in the same shipment and separate weights thereof are furnished or obtained, charges will be computed at the separate rates in this Quotation applicable to such commodities in straight shipments of the combined weight of the mixed shipment * * *."

Appellant supports this contention with the proposition that the carrier's tariff along with the bill of lading make up the contract of carriage, and that the parties cannot agree in the bill of lading or elsewhere to a departure from the tariff. Appellant refers to cases such as Davis v. Henderson, 266 U.S. 92, 45 S.Ct. 24, 69 L.Ed. 182. In that case, the Court held that a tariff rule, approved by the Interstate Commerce Commission (providing that orders for cars given the carrier's local agent must be in writing) cannot be waived by the carrier through

---

1. Citing, e. g., Norris Stamping & Mfg. Co. v. Pennsylvania R., 259 I.C.C. 593.

2. Citing, e. g., Chicago B. & Q. R. v. United States, 73 Ct.Cl. 250.

the agent's acceptance of oral notice from the shipper. The Davis case involved a private shipper; it did not involve a situation where the shipper was the United States Government.

Appellee maintains that appellee and appellant can lawfully contract for the transportation of explosives with other articles at rates other than those set forth in appellee's government rate quotation, and that there is substantial evidence in the instant case to support the district court's finding that appellant and appellee agreed upon the rates set forth in the bills of lading for such shipments.

In Public Utilities Commission of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470, the Court considered a statute enacted by the State of California which would have made contingent upon the Commission's prior approval continuation of the Federal Government's practice of negotiating with common carriers special rates for the shipment of government property within the state. The United States had sued in a federal court for a declaratory judgment declaring the state statute unconstitutional insofar as it prohibited carriers from transporting government property at rates other than those approved by the Commission. The Court held that when Congress authorizes its procurement agents to negotiate rates, a state may not require that those rates be approved by it.

The Supreme Court pointed to certain government regulations and indicated that these sanction the policy of "negotiating rates for shipment of federal property and entrust the procurement officers with the discretion to determine when existing rates will be accepted and when negotiation for lower rates will be undertaken." Id. at 542–543, 78 S.Ct. at 452.

Section 22(1) of the Interstate Commerce Act, 49 U.S.C. § 22(1), exempts transportation for the United States from the rate provisions of that Act; it states, in part: "Nothing in this chapter shall prevent the carriage * * * of property free or at reduced rates for the United States * * *."

Section 22(2) of this Act, 49 U.S.C. § 22(2), states, in part:

"All quotations or tenders of rates, fares or charges under paragraph (1) of this section for the transportation, storage, or handling of property or the transportation of persons free or at reduced rates for the United States Government, or any agency or department thereof, including quotations or tenders for retroactive application whether negotiated or renegotiated after the services have been performed, shall be in writing or confirmed in writing and a copy or copies thereof shall be submitted to the Commission by the carrier or carriers offering such tenders or quotations in the manner specified by the Commission * * *."

In the instant case, appellee charged for each entire shipment at the higher rate applicable to one of the articles, i. e., $ .68 cwt. No tender or quotation of rates was specifically submitted for Items 8 and 8a under the provisions of Section 22(2). Appellee points to no other statute or regulation under which the facts might disclose a negotiation for the applicable rate had taken place.

Appellee's evidence to support its contention that a new and different contract with the government was entered into is the fact that the bill of lading had two statements on it in addition to the description of the commodities transported: "Rate $ .68 cwt. minimum weight 20,000 lbs. truckload," and, "Waiver to move by truck granted in accordance with ICC Reg. OP–5 Change 11." Appellee suggests that this latter statement indicated that the government originally contemplated sending the shipment by rail, that the mixed shipment rule of the railroads provides that where there is a mixed shipment the highest commodity rate prevails, and, that "Undoubtedly this was the reason that the government offered to pay on the basis of the rate of the highest rated commodity contained

therein, with respect to these two shipments." (Appellee's brief, p. 25.)

Finding II states, in part:

"With reference to Items * * * 8, 8a * * *, the rate charged in the Bill of Lading was agreed on by the United States through its Transportation Officer acting in the course and within the scope of his official duty and authority."

Was the rate really "agreed on" here? There is little testimony in the record relating to Items 8 and 8a.[3]

■ Based on this sparse testimony, it cannot be said that any rate was "agreed on." We hold that portion of Finding II that refers to Items 8 and 8a is, therefore, clearly erroneous.

■ Also, because of this, Conclusion of Law IV must be held to be error. Even were we to assume this Conclusion had support, it would still raise questions of considerable importance. The result of concluding that "a price posted on the Bill of Lading by the United States is a valid offer which if accepted becomes contractually binding on the United States" would be that once the Government posts a price on a bill of lading, the carrier having subsequently performed and alleging thereafter that it had accepted the government's offer, the government could not successfully prevail against the carrier for overcharges except under one of the defenses to the contract. In determining whether or not agreement on rates had been reached, the notation posted on the bill of lading should only be considered evidence on the question of whether or not there was an offer and an acceptance.

We note that both Public Utilities Commission of California v. United States, supra, and Section 22(2) of the Interstate Commerce Act concern negotiation of rates that are *lower* than existing rates as found in rate quotations. Here, appellee, by the proposition it is attempting to promote, attempts to have this court sanction its receipt of rates *higher* than existing rates for motor carriers.

## GROUP III: CONCLUSION

■ Finally, with reference to Items 11 and 11a, appellant contends that the district court erred in holding that a notation on a bill of lading of the equipment ordered and furnished is an appropriate annotation of a request for exclusive use of the equipment furnished.

Item 135 of the Loretz Quotation provided that the shipper could request ex-

---

**3.** John L. Beeler, a tariff publishing agent for motor carriers called on behalf of appellee, entered into the following colloquy with the Court:

"Q. What did you find [with respect to Item 8]?

"A. I found that that as billed originally by the defendant to be correct. It was billed by the defendant on the basis of the first-class carload rate, minimum weight, 20,000 pounds, as shown on page 15, rate basis 48, and page 21, rate of 68¢ a hundred pounds, first class, T.A.L. Loretz Quotation No. 1.

"Q. That is the same as the Government quotation that you have testified to in connection with the previous items, beginning with item '4'?

"A. Yes.

"Q. It is specified in typewriting on the bill of lading?

"A. Well, I had a note to the effect— Yes, that is true, your Honor, but there is also a further point. Apparently the shipment was originally to go by rail but there is a waiver on the bill of lading to show that they granted a waiver to move it by truck. In other words, the Government changed the routing and wanted it to go by truck. That is in item '8'—it is on the bill of lading.

"Q. The rate specified on the face of the bill of lading is 68¢ per hundred weight?

"A. Yes, because it was waived from rail to truck movement—apparently they understood it. That is my point.

"Q. The evidence so far is that the Government prepared this bill of lading and put on 68¢, minimum weight 20,000 pounds. I assume you are bound by it unless the officer acting acted unlawfully in doing it." (Record, p. 86.)

And, James L. Callan, Transportation Division, General Accounting Office, testified that he felt that there was "definitely" an overpayment by the Government on Items 8 and 8a.

clusive use of the carrier's equipment, but, if it did so, the shipper was subject to a minimum charge for the equipment based upon its size. Item 135 further provided that "Bills of lading shall be appropriately annotated to evidence exclusive use of carrier's equipment."

James L. Callan, the government employee referred to above, testified:

"The term 'exclusive use' is a very well defined word of art in transportation, in motor carriers, and I have never seen a shipment—carriers don't even claim it, they don't describe the word 'exclusive use request' on it. The fact they were furnished, that does not say they were requested. They have on there the rate—83½¢—they would have put it there, 'exclusive use of vehicle requested,' there is where they would have put it. It is just like a rail shipment—they put down the size car furnished and the number of the car. That does mean it is exclusive use of the car." (Record, pp. 123–124.)

A tariff publishing agent for motor carriers called by appellee, John L. Beeler, referring to Item 11, stated:

"Down in the body, or under the description. It does not state it exactly that way, but it does state that the Government does want furnished one set of 20-foot doubles, which is forty feet; two 35-foot Semis—cubic feet so and so; that the carrier then did furnish this equipment. Now, whether or not that constitutes a request [for exclusive use] within the meaning of the annotation, I am not prepared to say, but it seems to, to me * * * I have seen a good many bills of lading and they are annotated in different ways. This is the case of an unusual one. * * *" (Record, pp. 87–88.)

Based on this testimony, while some questions exist, it cannot be said that the finding of the district court with reference to Items 11 and 11a, that the bill of lading on its face demonstrated a request for exclusive use, is clearly erroneous.

Based on the above considerations, we affirm the judgment of the district court with respect to Items 5, 6, 7, 9, 10, 11 and 11a, and reverse with respect to Items 8 and 8a, and the case is remanded for proceedings consistent with this opinion.