PUBLIC   UTILITIES   COMMISSION   OF
CALIFORNIA  *v.*  UNITED  STATES.

No. 23.   Argued January 7, 1958.—Decided March 3, 1958.

*J. Thomason Phelps* and *Everett C. McKeage* argued the cause and filed a brief for appellant.

*John F. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Hansen* and *Henry Geller.*

Briefs of *amici curiae* urging reversal were filed by *Will Wilson,* Attorney General, *James N. Ludlum,* First Assistant Attorney General, and *J. W. Wheller,* Assistant Attorney General, for the Railroad Commission of Texas et al., *Phillip Robinson* for the Texas Independent Motor Carriers, *Daryal A. Myse* for Hughes Transportation, Inc., and *Austin L. Roberts, Jr.* and *R. Everette Kreeger* for the National Association of Railroad and Utilities Commissioners.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Section 530 of the California Public Utilities Code, Cal. Stat. 1955, c. 1966, provides in part:

> "Every common carrier subject to the provisions of this part may transport, free or at reduced rates:
> "(a) Persons for the United States, . . . .
>
> .        .        .        .        .
>
> "The commission may permit common carriers to transport property *at reduced rates for the United States,* state, county, or municipal governments, *to such extent and subject to such conditions as it may consider just and reasonable.* Nothing herein shall prevent any common carrier subject to the provisions of this part from transporting property for the United States, state, county, or municipal governments, at reduced rates no lower than rates which lawfully may be assessed and charged by any other such common carrier or by highway permit carriers as defined in the Highway Carriers' Act." (Italics added.)

There is a large volume of military traffic between points in California. For many years the United States has negotiated special agreements with carriers as to the rates governing the transportation of government property. Property for the armed services has usually been transported at negotiated rates substantially equal to or lower than those applicable to regular commercial shipments.

The United States filed this suit for declaratory relief, 28 U. S. C. § 2201, in a three-judge District Court, asking that § 530 be declared unconstitutional insofar as it prohibits carriers from transporting government property at rates other than those approved by the Commission and requesting relief by injunction.

The District Court rendered judgment for the United States, 141 F. Supp. 168. The case is here by appeal, 28 U. S. C. §§ 1253, 2101 (b). We noted probable jurisdiction. 352 U. S. 924.

We are met at the outset with a contention that there is no "actual controversy" between the United States and the Commission within the meaning of 28 U. S. C. § 2201. If so, there is a fatal constitutional, as well as statutory, defect because of the manner in which the judicial power is defined by Art. III, § 2, cl. 1, of the Constitution. See *Aetna Life Ins. Co. v. Haworth*, 300 U. S. 227. The argument is that there is no allegation that the Commission had done or had threatened to do anything adverse to the United States or its agent.

Prior to 1955, § 530 provided that every common carrier "may transport, free or at reduced rates: . . . property for the United States . . . ." [1] In 1955, § 530 was amended to eliminate that provision and substitute the provision already noted that the Commission "may per-

---

[1] Cal. Stat. 1951, c. 764, p. 2045.

mit" common carriers to transport property of the United States at reduced rates "to such extent and subject to such conditions as it may consider just and reasonable." As also noted above, this amendment further provided that no common carrier shall be prevented from transporting property of the United States "at reduced rates no lower than rates which lawfully may be assessed and charged by any other such common carrier or by highway permit carriers . . . ."[2] Prior to this amendment the Commission had authorized highway permit carriers to deviate from the prescribed minimum rates in connection with the transportation of property for the armed forces of the United States. To prevent the continuation of this exemption the Commission on August 16, 1955, canceled the deviation authorization for permit carriers as of September 7, 1955, the effective date of the amendment to § 530. On request of the Department of Defense the Commission postponed the effectiveness of that cancellation until December 5, 1955. On November 29, 1955, the Commission denied a further extension, stating:

"The provision of Item No. 20 of Minimum Rate Tariff No. 2 which permits carriers to deviate from the minimum rates in connection with the transportation of property for the Armed Forces of the United States constitutes an exception which was established prior to the amendment of Section 530. So long as this provision remains in effect, not only the permitted carriers but also the common carriers are without the rate regulation which clearly was contemplated under the recent legislative enactment. . . .

---

[2] California Public Utilities Code § 3515 defines a "highway permit carrier" as "every highway carrier other than a highway common carrier or a petroleum irregular route carrier."

"The intent of the legislature should be carried out without further delay. Accordingly, the petition for further postponement will be denied. This action will in no way preclude carriers from filing applications for such rate exceptions as they may consider to be just and reasonable."

As a result of this denial, common carriers could no longer transport any United States property at lower negotiated rates without Commission approval. For § 486 requires common carriers to file their rates with the Commission. Section 493 provides that no common carrier shall engage in transportation until its schedules of rates have been filed. Section 494 provides that no common carrier "shall, charge, demand, collect, or receive a different compensation for the transportation of persons or property . . . than the applicable rates . . . specified in its schedules filed . . . ." (A like provision is contained in Art. XII, § 22 of the California Constitution.) Moreover the Public Utilities Code provides penalties for violations of its provisions and orders issued thereunder. §§ 2107, 2112. These penalties are applicable not only to the carrier but to shippers as well. California Public Utilities Code, § 2112. As stated by the District Court, "If a United States officer were to negotiate with a carrier for 'reduced rates' without permitting the defendant to determine whether it 'considered' the conditions of the contract 'just and reasonable', he could be thrown into the county jail." 141 F. Supp., at 186.

The Commission has plainly indicated an intent to enforce the Act; and prohibition of the statute is so broad as to deny the United States the right to ship at reduced rates, unless the Commission first gives its approval. The case is, therefore, quite different from *Public Service Comm'n* v. *Wycoff Co.*, 344 U. S. 237, where a carrier sought relief in a federal court against a state commission

in order "to guard against the possibility," *id.*, at 244, that the Commission would assume jurisdiction. Here the statute limits transportation at reduced rates unless the Commission first gives approval. The controversy is present and concrete—whether the United States has the right to obtain transportation service at such rates as it may negotiate or whether it can do so only with state approval.

There is a large group of cases involving the doctrine of primary jurisdiction which requires the complainant first to seek relief in the administrative proceeding before a remedy will be supplied by the courts. See *Far East Conference* v. *United States,* 342 U. S. 570; *United States* v. *Western Pacific R. Co.,* 352 U. S. 59. In related situations we have insisted that an aggrieved party pursue his administrative remedy before the state agency and the state court prior to bringing his complaint to the federal court, so that the true interpretation of the state law may be known and its actual, as opposed to its theoretical, impact on the litigant authoritatively determined before the federal court undertakes to sit in judgment. See *Alabama Federation of Labor* v. *McAdory,* 325 U. S. 450; *Leiter Minerals, Inc.,* v. *United States,* 352 U. S. 220.

These cases are inapposite. We know the statute applies to shipments of the United States. We know that it is unlawful to ship at reduced rates unless the Commission approves those rates. The question is whether the United States can be subjected to the discretionary authority of a state agency for the terms on which, by grace, it can make arrangements for services to be rendered it. That issue is a constitutional one that the Commission can hardly be expected to entertain. If, as in *Aircraft & Diesel Equipment Corp.* v. *Hirsch,* 331 U. S. 752, and *Allen* v. *Grand Central Aircraft Co.,* 347 U. S. 535, an administrative proceeding might leave no

remnant of the constitutional question, the administrative remedy plainly should be pursued. But where the only question is whether it is constitutional to fasten the administrative procedure onto the litigant, the administrative agency may be defied and judicial relief sought as the only effective way of protecting the asserted constitutional right. In that posture the case is kin to those that hold that "failure to apply for a license under an ordinance which on its face violates the Constitution does not preclude review in this Court of a judgment of conviction under such an ordinance." *Staub* v. *City of Baxley*, 355 U. S. 313, 319, and cases cited; *Thomas* v. *Collins*, 323 U. S. 516.

It is argued that 28 U. S. C. § 1342, bars the grant of relief in this case. It provides that the federal courts "shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

"(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution . . . ."

Assuming, *arguendo,* that the Act applies to the sovereign who made it, there is no violation of its mandate in the relief granted here. In the present case, the challenge is not to a rate "order" but to a statute which requires the United States to submit its negotiated rates to the California Commission for approval. The United States wants to be rid of the system that subjects its procurement services to that form of state supervision.

We come to the merits. Congress has provided a comprehensive policy governing procurement. 10 U. S. C. (Supp. V) §§ 2301–2314. While competitive bidding is

the general policy, § 2304 provides that "the head of an agency may negotiate such a purchase or contract, if—

.    .    .    .    .

"(2) the public exigency will not permit the delay incident to advertising;

.    .    .    .    .

"(10) the purchase or contract is for property or services for which it is impracticable to obtain competition; [3]

.    .    .    .    .

"(12) the purchase or contract is for property or services whose procurement he determines should not be

---

[3] The purpose of this subsection is "to place the maximum responsibility for decisions as to when it is impracticable to secure competition in the hands of the agency concerned." S. Rep. No. 571, 80th Cong., 1st Sess., p. 8. The Senate Report goes on to state: "The experiences of the war and contracts negotiated since the war in the fields of stevedoring, ship repairs, chartering of vessels, where prices are set by law or regulation, or where there is a single source of supply, have shown clearly that the competitive-bid-advertising method is not only frequently impracticable but does not always operate to the best interests of the Government. It is, therefore, intended that this section should be construed liberally and that the review of these contracts should be confined to the validity and legality of the action taken and should not extend to reversal of bona fide determinations of impracticability where any reasonable ground for such determination exists."

It would seem, therefore, that negotiation was contemplated where rates, fixed by a government agency, are involved. And see H. R. Rep. No. 109, 80th Cong., 1st Sess., pp. 8–9. As stated by W. John Kenney, Acting Secretary of the Navy, who submitted the draft of this bill:

"The primary purpose of the bill is to permit the War and Navy Departments to award contracts by negotiation when the national defense or sound business judgment dictates the use of negotiation rather than the rigid limitations of formal advertising, bid, and award procedures." Hearings before House Committee on Armed Services on H. R. 1366, 80th Cong., 1st Sess., Vol. 1, p. 425.

publicly disclosed because of their character, ingredients, or components; . . . ."

The regulations, promulgated to carry out these statutory provisions,[4] are numerous and extensive.[5]   One provides that "volume shipments" shall be referred "at the earliest practicable time to the appropriate military traffic management office for a determination of the reasonableness of applicable current rates and, when appropriate, for negotiation of adjusted or modified rates." [6]

The Army regulations provide that the "least costly means of transportation will be selected which will meet military requirements and still be consistent with governing procurement regulations and transportation policies as expressed by Congress, contingent upon carrier ability to provide safe, adequate, and efficient transportation." [7] Navy regulations provide that when applicable freight rates "appear excessive" they "may be negotiated for more equitable rates." [8]   The Air Force regulations provide for negotiations for adjustments or modifications of "commercial carriers' rates . . . only after a determination has been made as to the unreasonableness, unjustness or otherwise apparent unlawfulness of effective rates . . . ." [9]

It seems clear that these regulations—which have the force of law, *Leslie Miller, Inc.,* v. *Arkansas,* 352 U. S. 187;

---

[4] 10 U. S. C. § 3012 (g) provides, "The Secretary [of the Army] may prescribe regulations to carry out his functions, powers, and duties under this title."   For comparable provisions applicable to the Navy and Air Force see 10 U. S. C. § 6011 and 10 U. S. C. § 8012 (f) respectively.

[5] Armed Services Procurement Regulations, 32 CFR, 1957 Cum. Pocket Supp., § 1.108 *et seq.*

[6] *Id.,* § 1.306–10.

[7] Army Regulation 55–142, ¶ 2, dated April 19, 1956.

[8] Navy Shipping Guide, Part I, Art. 1800 (d) (3) (20).

[9] Air Force Manual 75–1, ¶ 80501 (b), dated July 10, 1956.

*Standard Oil Co.* v. *Johnson,* 316 U. S. 481—sanction the policy of negotiating rates for shipment of federal property and entrust the procurement officers with the discretion to determine when existing rates [10] will be accepted and when negotiation for lower rates will be undertaken. It also seems clear that under § 530 of the California Public Utilities Code this discretion of the federal officers may be exercised and reduced rates used only if the Commission approves. The question is whether California may impose this restraint or control on federal transportation procurement.

We lay to one side these cases which sustain nondiscriminatory state taxes on activities of contractors and others who do business for the United States, as their impact at most is to increase the costs of the operation. See, *e. g., Esso Standard Oil Co.* v. *Evans,* 345 U. S. 495; *Smith* v. *Davis,* 323 U. S. 111; *Alabama* v. *King & Boozer,* 314 U. S. 1; *James* v. *Dravo Contracting Co.,* 302 U. S. 134. We also need do no more than mention cases where, absent a conflicting federal regulation, a State seeks to impose safety or other requirements on a contractor who does business for the United States. See, *e. g., Baltimore & Annapolis R. Co.* v. *Lichtenberg,* 176 Md. 383, 4 A. 2d 734, appeal dismissed, 308 U. S. 525; *James Stewart & Co.* v. *Sadrakula,* 309 U. S. 94. *Penn Dairies* v. *Milk Control Comm'n,* 318 U. S. 261, can likewise be put to one side. There the question, much mooted, was whether

---

[10] Section 22 of the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. § 22, exempts transportation for the United States from the rate provisions of that Act. The provision in the law, respecting land-grant rates, which imposes on the United States the obligation to pay "the full applicable commercial rates," 49 U. S. C. § 65, applies only to rates fixed by the Interstate Commerce Commission and is made expressly subject to § 22 of the Interstate Commerce Act.

the federal policy conflicted with the state policy fixing the price of milk which the United States purchased. The Court concluded that the state regulation "imposes no prohibition on the national government or its officers." *Id.,* at 270. Here, however, the State places a prohibition on the Federal Government. Here the conflict between the federal policy of negotiated rates and the state policy of regulation of negotiated rates seems to us to be clear. The conflict is as plain as it was in *Arizona* v. *California,* 283 U. S. 423, 451, where a State sought authority over plans and specifications for a federal dam, in *Leslie Miller, Inc.,* v. *Arkansas, supra,* where state standards regulating contractors conflicted with federal standards for those contractors, and in *Johnson* v. *Maryland,* 254 U. S. 51, where a State sought to exact a license requirement from a federal employee driving a mail truck. The conflict seems to us to be as clear as any that the Supremacy Clause, Art. VI, cl. 2, of the Constitution was designed to resolve. As Chief Justice Marshall said in *M'Culloch* v. *Maryland,* 4 Wheat. 316, 427,

> "It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence."

The seriousness of the impact of California's regulation on the action of federal procurement officials is dramatically shown by this record.

It is the practice of the Government not only to negotiate separate rates which vary from the class or "paper rate" [11] but also to negotiate a "freight all kinds" rate

---

[11] The findings of the District Court state:

"Under the theory of rate regulation in California and elsewhere, every common carrier is required to have in existence at all times a

which will cover hundreds of diverse items for the supply of a division of the Army or for a vessel that are needed at one place at one particular time. There is no provision in the California Code or the regulations for the making of such shipments. The findings are that if the Code is applied here, this type of arrangement would be abolished:

> "This would make it necessary for the shipping officers to classify the hundreds and thousands of different items used in military operations, to segregate such items in accordance with published tariffs and classifications, to rearrange the boxing and crating of such items in order to meet the classifications and requirements of commercial traffic and fill out voluminous documents. This additional process could cause delays as high as thirteen hours in the shipment of one truckload or carload. In many situations a delay of this sort would seriously hamper or disrupt the military mission for which the shipment was made."

Moreover, no rates exist for much of the military traffic, which means that, unless the United States can negotiate rates for each shipment, the shipments will be delayed for Commission action unless shipped under the established rates which are higher than negotiated rates.

---

published rate to cover the shipment of every known item between every conceivable point. This rate structure is known as the class or 'paper rate.' Since the channels of commercial traffic are regular and well defined in accordance with the stability of trade, large commercial shippers seldom use the class rate but negotiate rates with the carriers known as 'commercial rates,' which are peculiarly suited and adapted to the requirements of the commerce involved. These commercial rates are usually considerably lower than the class rates. Very little commercial traffic moves at the class rate."

General Edmond C. R. Lasher of the United States Army, who was Assistant Chief of Transportation, testified at the trial:

> "for us to make these arrangements at the Washington level with the various states, let us say 48 states, with 48 varieties of methods to follow, we would find ourselves in an administrative morass out of which we would never fight our way, we would never win the war."

*Affirmed.*

MR. JUSTICE HARLAN, whom THE CHIEF JUSTICE and MR. JUSTICE BURTON join, dissenting.

I think that the Court moves with unnecessary haste in striking down this California statute which was intended to deal with rate-cutting practices of California carriers handling the heavy volume of military traffic in that State. These practices, the State tells us, have a seriously depressing influence upon revenues of carriers and might lead to a deterioration of the economic position of the California carrier industry as a whole. To guard against this possibility, the California Legislature amended § 530 of the Public Utilities Code by extending rate regulation to carriers dealing with the Federal Government. Maintenance of the proper balance between federal and state concerns in this area should lead us to proceed with caution before deciding that this regulatory statute is unconstitutional. We should not reach this conclusion before giving California an opportunity to interpret and implement this enactment so that we can fairly judge whether it does in truth trespass upon paramount federal interests. Accordingly, I dissent upon the several grounds given below.

## I.

Although Congress can no doubt foreclose a State from regulation of transportation rates between the Government and private carriers, such a purpose must be made manifest. The excerpts from federal procurement statutes and regulations quoted in the Court's opinion provide, in my view, an inadequate foundation for the conclusion that Congress has directed procurement officers to by-pass state minimum-price or rate regulation. It is difficult to believe that so important a decision has been taken in such an obscure manner. In contrast to the situation presented by the express exemption in § 22 of the Interstate Commerce Act, 49 U. S. C. § 22, of transportation for the United States from the rate provisions of that Act, no procurement statute declares inapplicable rate schedules covering *intrastate* transportation pursuant to state law, and there is no indication that federal procurement officers were not to operate within the framework of state economic regulation in negotiating to secure the best terms possible. The statutes and regulations relied upon by the Court as a manifestation of congressional intent to displace state economic regulation are substantially the same as those found wanting in this respect in *Penn Dairies, Inc.,* v. *Milk Control Comm'n of Pennsylvania,* 318 U. S. 261, where this Court said (at 275):

> "An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous. Considerations which lead us not to favor repeal of statutes by implication [citing cases] should be at least as persuasive when the question is one of the nullification of state power by Congressional legislation."

## II.

In the absence of an express federal policy to nullify state regulation, this Court's decisions make clear that the fact that the Government may not henceforth receive more advantageous shipping rates in California than those applicable to other intrastate shippers is not sufficient by itself to vitiate this state statute. The fact that the economic incidence of state price regulation or taxation falls upon the Government no longer alone gives rise to an implied constitutional immunity from such regulation. *E. g., Penn Dairies, supra,* at 269; *Alabama* v. *King & Boozer,* 314 U. S. 1; *James* v. *Dravo Contracting Co.,* 302 U. S. 134. In *Penn Dairies,* the Court upheld a Pennsylvania law setting minimum prices for milk as applied to a dealer selling milk in Pennsylvania to the United States for consumption at military camps. I can see no constitutional distinction between state regulation of the price of milk the Government must buy and of the price at which the Government must ship the milk it has bought. And surely, insofar as economic effect is concerned, nothing turns on the character of the commodity shipped, whether it be milk or a hydrogen bomb. Apart from discriminatory application of such a regulatory statute to the Government and other considerations not pertinent here, the constitutional validity of this California statute depends entirely on its noneconomic impact upon the Government—that is, upon a determination whether this statute interferes with the performance of governmental functions by military personnel or other federal employees. See *Johnson* v. *Maryland,* 254 U. S. 51; *Arizona* v. *California,* 283 U. S. 423.

## III.

The aspects of the California statute which the Court finds fatal to its constitutionality simply reflect antici-

patory views as to how the rate regulation will work in practice. I consider this to be an insufficient basis on which to proceed to the serious business of striking down state regulation, and I believe that final judgment as to constitutionality should be deferred until we know how California intends to apply § 530 of its Public Utilities Code and to accommodate the state interest in a stable rate structure with the federal interest in unimpeded performance of military and other governmental functions. In view of the fact that the possible effect of § 530 in imposing an increased economic burden upon the Government does not in itself require invalidation of this statute, it is to my mind no answer to say that a decision upon the statute's constitutionality need not be deferred pending recourse by the Government to the state Commission and courts, because the statute is unconstitutional on its face in that it subjects government arrangements with California carriers to control by the Commission. Indeed, the very intention of the California Legislature in making special provision for the Government to negotiate with the Commission was to enable it to secure advantageous rates which would not even have been possible if the rate schedules were binding upon all shippers without the possibility of administratively granted exceptions. Cf. *Penn Dairies, supra.*

The purpose in requiring the Government to proceed through the state Commission in the first instance, the path which I think should be followed here, would not be to permit the state Commission or courts to pass upon the statute's constitutionality. That of course is the ultimate responsibility of this Court. Rather the purpose would be to determine if the statute can be so implemented as to overcome objections which the Government could present to the Commission. After such proceedings, we would not be compelled to consider the constitutional question under the uninformed view as to

the actual operation of the statute which we now have. More than abstract or potential impingement upon, or the mere possibility of interference with, some federal function should be shown before we are justified in thwarting otherwise legitimate state policy.

Some examples of the factors stressed by the Government as indicating the obstructive effect of this statute upon military functions suffice, I think, to demonstrate that the Court has acted prematurely in passing on constitutionality at this stage: (1) The Government has contended that disproportionately high rates would be imposed on military traffic because special "commodity" rates normally have not been established for many articles peculiar to military transportation, thus requiring recourse to higher "class" rates. The State has countered with the suggestion that the Commission might authorize retroactive rates which would enable the Government in effect to achieve commodity rates after shipments of presently unscheduled items. (2) It is alleged that excessive delay of vital military shipments may result if army officers are required to determine in advance applicable rates for all items in a varied shipment. Again the State suggests that retroactive determination of rates after the shipment may be the solution. (3) We are told that national security may be prejudiced if the military is forced to reveal the content of particular shipments to determine applicable rates in existing schedules, in lieu of following the present practice of negotiating a general rate for an entire shipment without specifying its content. This obviously important concern is recognized by the State, which emphasizes the Commission's ability to cope with this problem, as by exempting from the usual procedures under § 530 all shipments declared to be "security shipments" by a responsible federal authority. (4) The "freight all kinds" rate noted by the Court as in current widespread use in military shipments is not expressly

provided for by the California statute. Appellant, although frankly stating that this rate is a major vehicle for the price-cutting practices which the amended § 530 was designed to prevent, raises the possibility that a comparable method less productive of such practices might be approved by the Commission. If so, major administrative problems portrayed by the Government would evaporate. (5) The Court adverts to the possibility that state criminal statutes punishing certain parties for deviation from established rates might be applied against federal procurement officers. It will be time enough to dispose of this problem if such a prosecution should ever be brought, a possibility the State here emphatically discards.

I do not, of course, venture to predict whether the Commission might have been able to meet all objections of the Government by restricting the statute to purely economic regulation if it had been given the opportunity, but I do not see how we can say that such a possibility does not exist. It may be that what is now envisioned by the Government would not come to pass at all, for we should not assume that California will be less sensitive than others to the serious considerations urged by the Government with respect to shipments of vital military supplies. Moreover, it is hardly likely that the objections asserted against the application of the statute to military shipments would have the same force with respect to shipments of nonmilitary commodities by other government agencies; yet as to these too the Court annuls the statute.

Unless something more than the remote possibility of hindrance of government functions is enough to justify invalidation of such state statutes, I fail to see why under this decision all state tariff regulation is not automatically ineffective as against the Federal Government. I would not so extend the doctrine of implied

federal immunities, especially when Congress has the undoubted power to deal directly with such matters according to its assessment of the competing state and federal interests involved. The Court has not heretofore gone to the extreme of this decision, and I find it anomalous that the very Term which witnesses a further diminution of the doctrine of implied intergovernmental tax immunities should produce this decision. See, *e. g., City of Detroit* v. *Murray Corp.,* 355 U. S. 489, decided this day.

## IV.

This Court should scrupulously withhold its hand from voiding state legislation until the effect on federal interests has appeared with reasonable certainty through clarifying construction and implementation of the challenged enactment by the State. Past decisions of the Court reflect the application of this general principle in a variety of situations involving state statutes or administrative action. *Railroad Comm'n of Texas* v. *Pullman Co.,* 312 U. S. 496, 501; *Spector Motor Service, Inc.,* v. *McLaughlin,* 323 U. S. 101, 105; *Leiter Minerals, Inc.,* v. *United States,* 352 U. S. 220, 228–229. Cf. *Alabama Federation of Labor* v. *McAdory,* 325 U. S. 450, 471; *Public Service Comm'n of Utah* v. *Wycoff Co.,* 344 U. S. 237, 246–247. In *Spector Motor,* the Court stated: "[A]s questions of federal constitutional power have become more and more intertwined with preliminary doubts about local law, we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law." 323 U. S., at 105. And the language of the Court in *Alabama Federation of Labor* v. *McAdory,* 325 U. S., at 471, is very much in point here:

"The extent to which the declaratory judgment procedure may be used in the federal courts to control

state action lies in the sound discretion of the Court. . . . It would be an abuse of discretion for this Court to make a pronouncement on the constitutionality of a state statute . . . when the Court is left in uncertainty, which it cannot authoritatively resolve, as to the meaning of the statute when applied to any particular state of facts. . . . In the exercise of this Court's discretionary power to grant or withhold the declaratory judgment remedy it is of controlling significance that it is in the public interest to avoid the needless determination of constitutional questions and the needless obstruction to the domestic policy of the states by forestalling state action in construing and applying its own statutes."

I see no good reason for departing now from that wise policy. In my view the Government should be remitted to the California Commission and courts to test there, in the first instance, the application of this statute, and the federal courts should withhold final judgment on constitutionality until the true effect of the statute has thus become known. The Government, however, should be permitted to proceed during this period as it had before § 530 was amended, for any possibility of state interference with military or other governmental operations would thereby be avoided. I would therefore vacate the judgment below and so frame a remand as to enable the District Court to stay the operation of this statute until proceedings before the state Commission or courts have run their full course. Cf. *Leiter Minerals, Inc., supra.* The proper accommodation of the state and federal concerns here involved makes this in my view the appropriate disposition of this case.