**CHANNEL ONE SYSTEMS, INC.**

v.

**CONNECTICUT DEPARTMENT of PUBLIC UTILITY CONTROL; Mid-Connecticut Cable Vision Company; and Heritage Village Master Association.**

Civ. No. 86–150(AHN).

United States District Court,
D. Connecticut.

April 11, 1986.

David Silverstone, Silverstone & Koontz, Hartford, Conn., for plaintiff.

Phyllis Lemell, Asst. Atty. Gen., New Britain, Conn., William Rubenstein, Hartford, Conn., Mark Dost, Waterbury, Conn., for defendant.

## MEMORANDUM OF DECISION

NEVAS, District Judge.

This action for declaratory and injunctive relief seeks an interpretation and application of the recently-enacted Cable Communications Policy Act of 1984 (the "Cable Act"). Plaintiff Channel One Systems, Inc. ("Channel One") requests declaratory relief by this court that a state agency authorized by the Cable Act and by state statute

to regulate operators of cable systems is, in this case, prohibited from regulating a Channel One facility which provides cable service in Southbury, Connecticut. Channel One also seeks to permanently enjoin the state agency from enforcing its decision concerning Channel One's facility and from preventing the continuing rehabilitation of the facility.

Defendants contend that this court lacks jurisdiction to entertain the action. Before addressing these asserted jurisdictional infirmities, a discussion of the procedural background is appropriate.

*Procedural Background*

Channel One commenced this action on January 13, 1986, against the State of Connecticut's Department of Public Utility Control ("DPUC"). Channel One waited until February 13, 1986, to pursue a temporary restraining order. Mid-Connecticut Cablevision Company ("Mid-Connecticut"), a cable operator holding a certificate of public convenience and necessity to provide cable service in certain Connecticut towns including Southbury, moved to intervene as a defendant pursuant to Rule 24, Fed.R. Civ.P. (Filing no. 7). On February 28, 1986, the court conducted a hearing on the request for a temporary restraining order. At the start of the hearing, Mid-Connecticut's motion to intervene was granted without objection. (Feb. 28, 1986 transcript ("Tr.") at 4, filing no. 16). Mid-Connecticut actively participated with the other parties in the hearing. Through the offering of exhibits and the testimony of Channel One's president, Fred Hopengarten, Channel One met its burden of showing "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward [Channel One]." *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983) (quoting *Jackson Diary, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)). (Feb. 28 Tr. at 73–76). An order restraining the DPUC from acting against Channel One for ten days was then issued. (Tempo-

rary restraining order, filing no. 14). In addition, Channel One was ordered to join as a party the association with which it contracted to provide cable service. (Feb. 28 Tr. at 73). The Heritage Village Master Association ("HVMA") was joined as a defendant on March 7, 1986. (Filing no. 23).[1]

On March 10, 1986, a preliminary injunction hearing was held during which the parties participated fully by offering exhibits, testimony, and legal memoranda. Recognizing this matter's importance and the need for an immediate ruling, the court rendered its decision from the bench on March 11, 1986, enjoining the DPUC from interfering with Channel One's activities at Heritage Village pending a final resolution of this action. (Mar. 11, 1986 Tr. at 3–12, filing no. 69; preliminary injunction order, filing no. 29). In its ruling, the court stated that the DPUC's decision of January 14, 1986,[2] clearly indicated the agency's intent to enforce state law against Channel One, otherwise the decision would be an empty gesture. Therefore, at that time, a "present and concrete" controversy between the parties was perceived to exist. *Public Utilities Commission of California v. United States,* 355 U.S. 534, 538–39, 78 S.Ct. 446, 449–50, 2 L.Ed.2d 470 (1958). Also, Channel One was not required to exhaust all available administrative remedies before seeking relief in this court since its complaint was grounded on federal preemption. *Housatonic Cable Vision Co. v. Department of Public Utility Control,* 622 F.Supp. 798, 803–04 (D.Conn.1985) (Blumenfeld, J.) (and cases cited therein).

Channel One was found to have met its burden for the obtaining of a preliminary injunction. Irreparable harm was proved by the testimony of Channel One's president that Channel One would suffer a substantial loss of good will with potential customers because of its inability to sell subscriptions and because it was being "portrayed as a law breaker." (Feb. 28 Tr. at 24). He also testified about the possibility of Channel One going out of business were an injunction not to issue. (*Id.* at 35, 47). The court found that if Channel One were unable to continue installation, it

---

1. Since no controversy exists here between Channel One and HVMA, a named defendant, HVMA will not be treated as a defendant. HVMA has maintained its alliance with Channel One during the proceedings. (HVMA's pre-trial memorandum at 1; Mar. 10 Tr. at 6–8). *See*

10A C. Wright, A. Miller & K. Kane, *Federal Practice and Procedure: Civil 2d* Section 2768 at 752–53 (2d ed. 1983).

2. See factual finding number 57 for the substance of the DPUC decision.

would lose incalculable and unrecoupable revenues, it would risk being in default of a loan agreement due to a failure to meet installation schedules, and it would risk the termination of its agreement with HVMA. (Mar. 11 Tr. at 8–9). At the hearing, Channel One demonstrated that the DPUC decision created a "cloud" of uncertainty concerning its ability to provide cable service. (Mar. 10, 1986 Tr. at 18, 35–36, filing no. 30). Cf. *Satellite Television of New York v. Finneran*, 579 F.Supp. 1546, 1551 (S.D. N.Y.1984) (in a pre-Cable Act case, an injunction issued to permit a private cable company to continue construction of a cable facility solely on private property).

During the hearing, Channel One also sufficiently satisfied the second part of the standard for injunctive relief, that is a showing of "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward [Channel One]." *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d at 45. At that time, a serious question existed concerning the new Cable Act's preemptive effect on the DPUC's authority to issue a decision indicating an intent to regulate Channel One's facility which at that time was alleged to be solely on private property. Furthermore, Channel One presented letters it had received from the Federal Communications Commission, raising serious questions concerning the accuracy of the DPUC's recent decision. (*See* attachments to: the complaint; Channel One's supplemental memorandum in support of temporary restraining order, filing no. 11; Mid-Connecticut's supplemental memorandum opposing preliminary injunction, filing no. 25).

The balance of hardships were found to tip decidedly in Channel One's favor because it was the only party that could be injured if there were no order maintaining the status-quo until trial. Mid-Connecticut would continue to be free to solicit customers and provide cable service at Heritage Village. Without minimizing the DPUC's important role in regulating State cable operators and assuring that residents of Connecticut receive cable services, the relatively short time taken to hear this matter has not caused undue hardship. Channel One's president was prepared to risk losing his investment at Heritage Village if Channel One's litigation efforts at trial proved unsuccessful. (Feb. 28 Tr. at 24).

Channel One posted security in the amount of $20,000 on the issuing of the preliminary injunction order pursuant to Rule 65(c), Fed.R.Civ.P. (Filing no. 58).

In preparing for a prompt trial, the parties proceeded under an expedited discovery schedule. (Scheduling order, filing no. 28). The parties prepared pre-trial memoranda and proposed findings of fact and conclusions of law.

At the trial on March 31, and April 1, 1986, the parties presented six witnesses. Channel One presented three witnesses:

1. Dr. Perry I. Klein, an expert on infra-red link technology;
2. Alan Burch, Channel One systems engineer; and
3. Fred Hopengarten, president of Channel One.

The defendants called three witnesses:

1. Timothy Carr, Mid-Connecticut construction manager;
2. Robert McGhee, HVMA's president; and
3. Donald Wagner, Heritage Village manager.

Twenty-seven exhibits were admitted into evidence.

Considering the critical nature of this controversy, the fact that Channel One is still in the planning phase and that the DPUC is enjoined from acting against Channel One's Heritage Village project, a prompt ruling is necessary. Therefore, this decision is written without the benefit of a trial transcript.

This memorandum of decision is the court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.P.

### Findings of Fact

1. Channel One Systems, Inc. is a Massachusetts corporation in the business of providing cable television service in Connecticut, New Jersey, and Massachusetts. (Complaint para. 2; Feb. 28, 1986 transcript ("Tr.") at 37; Mar. 10, 1986 Tr. at 25).

2. On August 1, 1985, Channel One entered into a non-exclusive agreement with the Heritage Village Master Association, Inc. ("HVMA") to provide cable service at Heritage Village in Southbury, Connecticut. (Hopengarten's Feb. 13, 1986 affidavit para. 8, filing no. 5; exhibit L, agreement; exhibit S, Sept. 1985 letter from

Channel One to Heritage Village residents; Feb. 28 Tr. at 19–20).

3. Heritage Village is an 1100-acre private community consisting of approximately 24 individually formed condominiums totalling 2,580 units. (McGhee and Wagner's trial testimony; exhibits A–F, cable layout maps of HVMA).

4. HVMA is the managing agent for the individual associations at Heritage Village. (McGhee's trial testimony).

5. HVMA owns and operates a master antenna television ("MATV") system which was installed during the building of the condominium complex. (McGhee and Wagner's trial testimony).

6. The MATV system receives television broadcast signals off the air and delivers them to Heritage Village residents through 35 miles of coaxial cable. (McGhee and Wagner's trial testimony; exhibit A).

7. The MATV facility consists of a 150 foot tower with antennas that receive the broadcast signals. (Hearing testimony of Edward Meeker, Sr., Heritage Village MATV system manager, Mar. 10 Tr. at 81).

8. The signals are received and processed at what is called the "headend." (Mar. 10 Tr. at 82).

9. The headend is located on private property. (Exhibit A; Mar. 10 Tr. at 42–43).

10. The signals are processed for insertion into three cables. One cable runs to an office building for monitoring, a second cable runs west, and a third cable runs east. (Mar. 10 Tr. at 82).

11. The underground cables carry signals from the headend to residents' television sets. (Exhibits A–F; Mar. 10 Tr. at 82–91).

12. Above-ground trunk amplifiers connected to the cable at various locations boost the signal passing through the cable. (Exhibit A; Mar. 10 Tr. at 83).

13. Six public roads meander through the Heritage Village complex. These are New Wheeler Road, North Poverty Road, Poverty Road, Old Poverty Road, East Hill Road, and Hillhouse Road. (Counsel's stipulation at trial; exhibit A).

14. In Southbury, the minimum width of a public right-of-way for a local resi-

dential street is 50 feet and for a thoroughfare is 60 feet. (Exhibit I at 2–6, Town of Southbury road specifications; Carr's trial testimony).

15. The public right-of-way for New Wheeler Road is 60 feet. (Exhibit H, map of New Wheeler Road; Carr's trial testimony).

16. MATV cable and trunk amplifiers with pedestals are situated in the public right-of-way. (Carr's trial testimony).

17. According to Channel One's president, there are 12 underground crossings of public roads by cable. (Mar. 10 Tr. at 50, 67).

18. Examples of underground cable crossing public roads are two cables crossing New Wheeler Road. (Exhibits A–F; Mar. 10 Tr. at 83–85; Carr's trial testimony).

19. Both the cable and trunk amplifiers with pedestals located along New Wheeler Road are in the public right-of-way. (Exhibits A; Mar. 10 Tr. at 95; Burch and Carr's trial testimony).

20. Channel One's agreement with HVMA is to rehabilitate HVMA's existing MATV facility in order to provide both off the air broadcast service and cable service. (Exhibit L para. 2–1; Feb. 28 Tr. at 19–22; Hopengarten's trial testimony).

21. HVMA granted Channel One "an exclusive license to operate and supply through the MATV distribution system pay television service, as the phrase is ordinarily used in the cable TV industry, to residents of the Condominium Complex." (Exhibit L para 3.1).

22. Channel One uses the existing headend plus one earth station, which has two satellite dishes for receiving satellite signals. (Feb. 28 Tr. at 52–53; Mar. 10 Tr. at 81).

23. The earth station was installed in September or October, 1985. (Feb. 28 Tr. at 53).

24. When received, satellite signals are fed into the processing equipment and then into cable. (Mar. 10 Tr. at 81).

25. In the fall of 1985, Channel One first began to supply satellite signals to Heritage Village residents. (Mar. 10 Tr. at 55; exhibit P, Channel One customer list).

26. Those residents of Heritage Village subscribing to satellite service were charged on a monthly basis. (Feb. 28 Tr. at 28–29).

27. Both broadcast signals and satellite signals received at the headend use the cable originally installed for the MATV system. (Exhibit A; Mar. 10 Tr. at 55–56, 81–84).

28. Satellite signals were carried by cable crossing public rights-of-way up until about March 6, 1986. (Mar. 10 Tr. at 89–90).

29. Heritage Village residents located on the other side of public rights-of-way from the headend received satellite service. (Mar. 10 Tr. at 93–94; exhibit G, Channel One work reports; exhibit P; Hopengarten and McGhee's trial testimony).

30. To enable Channel One to provide satellite service without using any cable or equipment in the public rights-of-way, Channel One has proposed using infra-red links, or what has been called in this litigation "roadhoppers," to transmit signals across public rights-of-way. (Feb, 28 Tr. at 21; Hopengarten's trial testimony).

31. In December, 1985, Channel One decided to use infra-red links. (Mar. 10 Tr. at 64–65).

32. Dr. Perry I. Klein testified as an expert about the infra-red link and its new found use in the cable industry. (Klein's trial testimony).

33. An infra-red link using an infra-red frequency, which is within a subset of the electromagnetic spectrum, carries a signal on a direct, narrow, and specific line of sight path from a transmitting point to a receiving point. (*Id.;* exhibit 5, infra-red link manufacturer specifications).

34. An infra-link is capable of carrying satellite signals and off the air broadcast signals, such as those received at the Heritage Village facility. (Klein's trial testimony).

35. The signal path of an infra-red link is not visible from the ground. (*Id.*).

36. An infra-red link is subject to interference if its line of sight path is obstructed by the weather or a solid object. (*Id.*).

37. These infra-red links are not regulated or licensed by the Federal Communications Commission. (*Id.*).

38. Channel One's plan for providing cable service is in the design stage and is constantly changing. (Burch and Hopengarten's trial testimony).

39. Channel One is not operating under a firm construction schedule, and is changing its plans during construction. (Mar. 10 Tr. at 41–42, 64–66; Burch's trial testimony).

40. The most recent configuration for providing cable service is a preliminary hand-drawn map that was prepared on March 18, 1986. (Exhibit 7, map)

41. The map fails to show one of the public roads and indicates the need to install cable on property not owned by HVMA. (McGhee's trial testimony).

42. The plan will be revised as the installation continues, in order to assure that the entire facility is on private property. (Burch's trial testimony).

43. Channel One's tentative plan is to relocate to private property the cable and equipment which are now in the public rights-of-way. (Burch and Hopengarten's trial testimony).

44. However, portions of the system must be installed on or relocated to property not owned by HVMA. (Burch and McGhee's trial testimony).

45. Easements for installation on non-HVMA property have not been procured. (*Id.*).

46. Although Channel One intends to install infra-red links to cross public rights-of-way, (Mar. 10 Tr. at 65), HVMA has not authorized the location of any infra-red link, (McGhee's trial testimony; exhibit N, Mar. 12, 1986, letter from HVMA counsel to Channel One).

47. Channel One received delivery of an infra-red link on March 30, 1986, but it cannot be installed without permission

from HVMA. (Mar. 10 Tr. at 70–71; Hopengarten and McGhee's trial testimony).

48. While the fate of those cables crossing under public roads is not clear, Channel One apparently intends to cut the ends of the cable where it begins to cross under the public right-of-way, capping the ends. (Mar. 10 Tr. at 70–71; Hopengarten and McGhee's trial testimony; exhibit N; exhibit O, Mar. 14, 1986, letter from Channel One's vice-president to HVMA).

49. The cut cables under the public right-of-way will be left in place and could be reconnected in the future. (Exhibits N and O).

50. The cable on private property is intended to remain part of the system. (Mar. 10 Tr. at 70–71).

51. Optimistic dates for the project's completion range from July, 1986 to December, 1986. (Mar. 10 Tr. at 41; Burch and Hopengarten's trial testimony).

52. Channel One has not received HVMA's approval to cut any cable. (Mar. 10 Tr. at 53; exhibit N; McGhee's trial testimony).

53. Connecticut regulates cable television systems through its DPUC. (Conn. Gen.Stat. Section 16–331(a), as amended by Public Act No. 85–509).

54. Prior to constructing or operating a cable television system, a cable operator is required to undertake procedures to obtain a certificate of public convenience and necessity from the DPUC. (Conn.Gen.Stat. Sections 16–1 and 16–331, as amended by Public Act 85–509).

55. Channel One is not a holder of a certificate of public convenience and necessity to provide cable television service in Southbury, Connecticut. (Complaint para. 6).

56. Mid-Connecticut is the only holder of a certificate of public convenience and necessity to provide cable television service in Southbury, Connecticut. (Exhibit 3; Mar. 10 Tr. at 117–18).

57. On October 2, 1985, the DPUC conducted a hearing concerning a petition filed by Mid-Connecticut requesting the DPUC to investigate Channel One and HVMA's cable service agreement. The DPUC issued its decision on January 14, 1986 ("Decisions"), concluding that:

> [T]he combined operation pursuant to the proposed contract between Channel One and [HVMA] would constitute operation of a community antenna television system. The use of road hoppers in the proposed system does not exempt the cable system from the requirement to obtain a certificate of public convenience and necessity. Implementation of the proposed contract without first obtaining a certificate of public convenience and necessity would constitute a violation of Section 16–331(a) of the Connecticut General Statutes.

(Exhibit U, DPUC decision entitled "DPUC Investigation of Unlawful Provision of Cable Television Service to Heritage Village in the Town of Southbury," docket no. 85–04–05, at 6).

58. Channel One filed a motion for rehearing, reconsideration, and stay of the DPUC Decision on February 3, 1986. (Exhibit V).

59. On February 13, 1986, HVMA moved for rehearing, reconsideration, and stay of the DPUC Decision. (Exhibit X).

60. On February 25, 1986, Channel One withdrew its motion. (Exhibit W).

61. Since the filing of its Decision, the DPUC has taken no further action with regard to this matter. (Representation by DPUC counsel).

## DISCUSSION

### 1. *Regulation of the Cable Industry*

Congress passed the Cable Communications Policy Act of 1984 ("Cable Act") on October 11, 1984, and it became effective on December 29, 1984. Pub.L. No. 98–549, 98 Stat. 2779 (1984), codified as 47 U.S.C. Section 521 *et seq.* The Cable Act enumerates the establishment of "a national policy concerning cable communications" as the first of six purposes. 47 U.S.C. Section 521(1). The Cable Act changed the regula-

tory structure of the cable television industry, establishing a comprehensive scheme for the regulation of cable services at the federal, state, and local levels.[3] Consistent with Congress' intent, the Cable Act vests states with authority to regulate cable television through the franchise process. H.R. Rep. No. 98–934, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. & Ad. News 4655, 4656; 47 U.S.C. Section 541(b)(1).

Connecticut has regulated cable television systems, or what the State terms Community Antenna Television Companies ("CATV"), since 1965. Conn.Gen.Stat. 16–1 *et seq.* CATV systems, like public utilities, are regulated by Connecticut's DPUC. *Id.* Since the passage of the Ca-

ble Act, the Connecticut legislature enacted new legislation designed to regulate CATV systems and franchise cable operators. Pub. Act No. 85–509, amending portions of Conn.Gen.Stat. Sections 16–1 *et seq.* (effective July 7, 1985) (the "CATV Act").

The relevant sections of the Cable Act are in harmony with Connecticut's CATV Act for purposes of this case. The Cable Act requires that a "cable operator" may not provide "cable service" after July 1, 1984, without a "franchise." 47 U.S.C. Section 541(b)(1), (b)(2). The Cable Act's definition section gives these quoted words meaning. 47 U.S.C. 522.[4]

The relevant definitions in the CATV Act, Conn.Gen.Stat. Section 16–1(a),[5] paral-

---

**3.** A discussion of the Cable Act may be found at Meyerson, *The Cable Communications Policy Act of 1984: A Balancing Act on the Coaxial Wires,* 19 Ga.L.Rev. 543 (1985).

**4.** The relevant terms in the Cable Act are defined in section 522 as follows:

(4) the term "cable operator" means any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the managment and operation of such a cable system;

(5) the term "cable service" means—

(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection of such video programming or other programming service;

(6) the term "cable system" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, but such term does not include (A) a facility that serves only to retransmit the television signals of 1 or more television broadcast stations; (B) a facility that serves only subscribers in 1 or more multiple unit dwellings under common ownership, control, or management, unless such facility or facilities uses any public right-of-way; ...

(8) the term "franchise" means an initial authorization, or renewal thereof ... issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system;

(9) the term "franchising authority" means any governmental entity empowered by Federal, State, or local law to grant a franchise;

**5.** The relevant terms in the CATV Act, section 16–1(a), are:

"Community antenna television company" includes every corporation, company, association, joint stock association, partnership or person, or lessee thereof, owning, leasing, maintaining, operating, managing or controlling a community antenna television system, in, under or over any public street or highway, for the purpose of providing community antenna television service for hire;

"Community antenna television service" means (1) the one-way transmission to subscribers of video programming or information that a community antenna television company makes available to all subscribers generally, and subscriber interaction, if any, which is required for the selection of such video programming or information and (2) non-cable communications service;

"Community antenna television system" means a facility, consisting of a set of closed transmission paths and associated signal generation, reception and control equipment that is designed to provide community antenna television service which includes video programming and which is provided in, under or over any public street or highway, for hire, to multiple subscribers within a franchise, but such term does not include (1) a facility that serves only to retransmit the television signals of one or more television broadcast stations; (2) a facility that serves only subscribers in one or more multiple unit dwellings under common ownership, control or management, unless such facility is located in, under or over a public street or highway; ....

lel those definitions in the Cable Act. The DPUC, as the State franchising authority, 47 U.S.C. Section 522(9), Conn.Gen.Stat. Section 16–331(a), may regulate cable operators consistent with the Cable Act. 47 U.S.C. Section 544(a). Connecticut's franchising statutes which are consistent with the Cable Act are not preempted by federal law. 47 U.S.C. Section 556(b), (c). *See Housatonic Cable Vision Co.*, 622 F.Supp. at 806, 812. Worthy of note is the fact that the DPUC may now issue more than one certificate for cable operations in any franchise area or portion of a franchise area. Conn.Gen.Stat. Section 16–331(a).

This action concerns the DPUC's determination that Channel One is a cable operator (CATV company) and, therefore, is subject to DPUC regulation. According to section 522(4), for Channel One to be a cable operator, it must provide "cable service" over a "cable system" or manage and operate a "cable system." It is agreed that Channel One's facility provides cable service. The critical issue concerning the facility at Heritage Village is whether it is a "cable system" within the meaning of section 522(6) or whether it is not a cable system because it falls within the exemption portion of section 522(6)(B). The determining factor in this case is whether the facility uses any public right-of-way. Since the CATV Act only regulates cable companies that provide cable service using public rights-of-way, the DPUC has jurisdiction to regulate Channel One's Heritage Village facility if it uses any public right-of-way.

Channel One requests a declaratory judgment by this court that "Channel One's use of infra-red links to connect commonly managed and controlled, multiple-unit dwellings on either side of public streets does not subject it to the licensing and regulatory authority of the Connecticut Department of Public Utility Control." (Complaint at 7).

### 2. *Propriety of a Declaratory Judgment*

Since the commencement of this action, the defendants DPUC and Mid-Connecticut have maintained that the court lacks jurisdiction to decide this action. Defendants contend (1) that this court cannot entertain an appeal from the DPUC, and (2) that this case is not ripe and, therefore, does not present a justiciable case or controversy.

### A. *Appeal from the DPUC*

Defendants contend that because this case does not involve federal preemption, it is an attempt by Channel One to appeal the DPUC's finding that Channel One is using public rights-of-way, and that a federal district court is without jurisdiction to sit in direct review of state tribunals. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Consequently, defendants argue, an appeal to the United States Supreme Court is the proper route to follow where a state tribunal is alleged to have erred, *Aristocrat Health Club of Hartford, Inc. v. Chaucer*, 451 F.Supp. 210, 218 (D.Conn.1978), or, an appeal to the Connecticut Superior Court is the proper remedy if Channel One wishes to relitigate the DPUC's interpretation of the Cable Act, Conn.Gen.Stat. Section 4–183. DPUC and Mid-Connecticut's joint proposed findings of fact and conclusions of law, paras. 45–46; Mid-Connecticut's pre-trial memorandum at 25.

Defendants' contentions may well be correct were this case not one raising an issue of federal preemption. The complaint requests a declaration of the Cable Act's preemptive effect on the DPUC Decision. Although this court does not offer an opinion on whether the DPUC Decision concerning the regulation of Channel One conflicts with the Cable Act and, therefore, is preempted, *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 1310, 51 L.Ed.2d 604 (1977), *Brookhaven Cable TV, Inc. v. Kelly*, 573 F.2d 765, 768 (2d Cir. 1978), *cert. denied*, 441 U.S. 904, 99 S.Ct. 1991, 60 L.Ed.2d 372 (1979), preemption remains an issue for consideration.

■ Channel One need not exhaust all available administrative remedies before seeking relief in this court when a controversy is found to exist and a complaint is

grounded on federal preemption. *Public Utilities Commission of California v. United States*, 355 U.S. 534, 538–39, 78 S.Ct. 446, 449–50, 2 L.Ed.2d 470 (1958); *Housatonic Cable Vision Co.*, 622 F.Supp. at 803–04. As for the availability of alternative remedies, Rule 57, Fed.R.Civ.P., specifically provides that the "existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."

### B. *Ripeness*

Defendants' second contention is that the court lacks jurisdiction because this controversy is not sufficiently ripe for adjudication. DPUC's pre-trial memorandum at 2–3; Mid-Connecticut's pre-trial memorandum at 26–27. The basis for their ripeness contention is simply that in order to determine whether the Heritage Village facility "uses" any public right-of-way, the exact configuration and location of the facility must be known. Since Channel One's plans are still changing and not yet final, a decision on whether Channel One is using the public right-of-way is "impossible." Mid-Connecticut's pre-trial memorandum at 25.

■ A federal court's Article III jurisdiction is limited to cases or controversies, U.S. Const. art III, Section 2, and, therefore, a federal court lacks the power to render advisory opinions or "to decide questions that cannot affect the rights of litigants in the case before [it]." *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)). Under the Declaratory Judgment Act a court of the United States "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. Section 2201. This statute creating a remedy provides that a court may render a declaration only when presented with "a case of actual controversy." *Id.*

■ The question of whether Channel One has alleged an abstract question not currently justiciable or an "actual controversy" proper for declaration is a matter of degree turning on the particular facts before the court. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). That question must be considered on a case-by-case basis, *Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501, 504 (2d Cir.1968), deciding whether "the facts alleged, under all the circumstances, show there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

The complaint alleges that Channel One's "cable television system at Heritage Village, as proposed and as partially constructed, does not use any public rights-of-way nor is any part of such system in, under or over any public streets or highways ... [but] is located solely on private property." (Complaint para. 9). That characterization of the system was not proved at trial. Rather, the facts portray a facility with substantial portions of underground cable and pedestal amplifiers in the public right-of-way.

■ The Heritage Village facility currently provides both broadcast service (MATV system) and satellite service using public rights-of-way, irrespective of Channel One's proposed use of infra-red links. The DPUC agrees that the MATV system is exempt from State regulation, regardless of its use of public rights-of-way, because it is not a cable system, 47 U.S.C. Section 522(6)(A); Conn.Gen.Stat. Section 16–1(a) (definition of CATV system subsection (1)). Also, as the DPUC recognizes, the CATV Act does not attempt to regulate a facility, such as Channel One's Heritage Village facility, which is located solely on private property and does not use public rights-of-way. DPUC's pre-trial memorandum at 17. However, when the Channel One provides

satellite signals to residents using the existing cable system, it uses public rights-of-way. This use of public rights-of-way in providing cable service subjects Channel One to DPUC regulation.

While Channel One has claimed that its facility "will be" and is "intended to be" on private property, the configuration and location of the facility is still on the drawing board. The timing of the relocation of that cable Channel One learned during this litigation was in the public right-of-way is admittedly uncertain. As for the new cable which must be placed on non-HVMA property, no easements have been procured. The court recognizes that a rehabilitation project such as the one at Heritage Village may require some planning as the work progresses. However, HVMA has not even approved the most recent draft plan. (Exhibit 7).

■ Any decision based on the facts as found would be a premature and advisory opinion about a phantom system not using any public right-of-way but using infra-red links to cross public roads.

■ Caution must be shown in deciding whether to render a declaratory judgment on an important issue of public law where, as here, "a ruling is sought that would reach far beyond the particular case." *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 243, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952). The Second Circuit has provided the following guidance on declaratory judgments.

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in use, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

*Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir.1969) (quoting Borchard, *Declaratory Judgments* 299 (2d ed.1941)), *cert. denied*, 397 U.S. 1064, 90 S.Ct. 1502, 25 L.Ed.2d 686

(1970). A court commits error in failing to provide declaratory relief if either of these objectives is possible. *Id.*

Declaratory relief will serve neither of Professor Borchard's objectives. A decision that infra-red links do or do not use public rights-of-way or that the DPUC does or does not have the authority to determine that infra-red links use public rights-of-way will not serve to clarify any legal relation in issue at this time. Since the Heritage Village facility currently uses public rights-of-way, it is subject to DPUC authority.

Channel One may find that the costs associated with placing the entire facility on private property including the obtaining of easements are prohibitive and it may then choose to abandon the project. A declaration would then unnecessarily decide questions of federal and state regulatory authority in the cable industry.

■ Even if Channel One has presented an actual controversy and this court has jurisdiction to render a declaratory judgment on the DPUC's authority to decide that infra-red links constitute a use of the public right-of-way, for those reasons previously stated this court declines to exercise its discretion and provide declaratory relief. Granting a declaratory judgment rests within the sound discretion of the trial court, and is reviewable on appeal. *Holup v. Gates*, 544 F.2d 82, 85 n. 3 (2d Cir.1976), *cert. denied*, 430 U.S. 941, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977).

This decision does not undertake to delineate the Federal Communication Commission's jurisdiction with respect to a state's jurisdiction under the Cable Act. This decision also does not decide whether a person providing cable service to residents in multiple dwelling units by means of a facility which is entirely on private property and which uses the new technology of infra-red links to cross public rights-of-way would not be a "cable operator" within the meaning the Cable Act, 47 U.S.C. 522(4). Nor does this court express a view on the authority of a state to license or regulate a facility serving subscribers in commonly owned, controlled, or managed multiple

dwelling units not using any public right-of-way. 47 U.S.C. 541(e). Such interpretations of the recently-enacted Cable Act, while encouraged by the parties, would be improper based on the teachings of *Wycoff* and on the present record.

 What may be stated is that a person providing cable television service using public rights-of-way by cables crossing under a public road or by cables and equipment lying in the public easement is a cable operator and must obtain a franchise. 47 U.S.C. Sections 522(4), 522(6), 541(b)(1); Conn.Gen.Stat. Sections 16–1(a) (definitions of CATV company and CATV system), 16–331. Channel One's *current* use of public rights-of-way to provide cable service to numerous units within a commonly owned and managed condominium complex, does not exempt Channel One from the Cable Act's franchising requirement.

### 3. *Propriety of an Injunction*

A recent Supreme Court decision makes clear that when a plaintiff seeks to enjoin state action because federal law preempts it, jurisdiction is proper. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899, n. 14, 77 L.Ed.2d 490 (1983) (action for injunctive and declaratory relief claiming that ERISA preempts certain state civil rights and disability payment statutes). In *Shaw*, the Supreme Court stated that:

> It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *See Ex parte Young*, 209 U.S. 123, 160–162 [, 28 S.Ct. 441, 454–55, 52 L.Ed. 714] (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. Section 1331 to resolve.

*Id.* (Citations omitted).

Channel One seeks to enjoin the DPUC from enforcing its Decision claiming that the DPUC's action is preempted by the Cable Act. Without more, the complaint raises a federal question. 28 U.S.C. Section 1331. However, for those reasons stated above, Channel One's system is currently within the DPUC's franchising authority. Enjoining the DPUC from doing what the Cable Act permits would be inappropriate at this time.

### *Conclusion*

For the foregoing reasons, the preliminary injunction order is vacated and this action is dismissed.